**Slip Op. 04-6**

**United States Court of International Trade**

| | |
|---|---|
| CHINA STEEL CORPORATION and YIEH LOONG,  Plaintiff,  v.  UNITED STATES,  Defendant,  and  BETHLEHEM STEEL CORPORATION; NATIONAL STEEL CORPORATION; UNITED STATES STEEL CORPORATION; GALLATIN STEEL COMPANY; IPSCO STEEL INC.; NUCOR CORPORATION; STEEL DYNAMICS, INC.; and WEIRTON STEEL CORPORATION,  Defendant-Intervenors. | Before: Pogue, Judge  Court No. 01-01040 |

[Commerce's Remand Determination affirmed.]

Decided: January 26, 2004

Miller & Chevalier Chartered (Karl Abendschein, Peter Koenig) for Plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Michael D. Panzera, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Augusto Guerra, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Dewey Ballantine LLP (Bradford L. Ward, Hui Yu) for Defendant-Intervenors Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation.

Schagrin Associates (Roger B. Schagrin) for Defendant-Intervenors Gallatin Steel Company, IPSCO Steel Inc., Nucor Corporation, Steel

Dynamics, Inc., and Weirton Steel Corporation.[1]

## Opinion

**Pogue, Judge:** This is a review of the Department of Commerce's Final Results of Redetermination Pursuant to Court Remand, Certain Hot-Rolled Carbon Steel Flat Products from Taiwan (Aug. 14, 2003) ("Remand Determ." or "Remand Determination").[2]  The Department's Remand Determination followed the Court's decision in China Steel Corp. v. United States, 27 CIT __, 264 F. Supp. 2d 1339 (2003) ("CSC/YL I")[3] (remanding aspects of Commerce's final affirmative antidumping duty determination in Certain Hot-Rolled Carbon Steel Flat Products from Taiwan, 66 Fed. Reg. 49,618 (Dep't Commerce Sept. 28, 2001) (notice of final determination of sales at less

---

[1]Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation collectively will be referred to as "Defendant-Intervenors I" or "Def.-Int. I," while Gallatin Steel Company, IPSCO Steel Inc., Nucor Corporation, Steel Dynamics, Inc., and Weirton Steel Corporation collectively will be referred to as "Defendant-Intervenors II" or "Def.-Int. II." The following domestic entities also supported the antidumping petition before the agency, although they are not parties to this action: U.S. Steel Group (a unit of USX Corporation), United Steelworkers of America, LTV Steel Company, Inc., and Independent Steelworkers Union. Certain Hot-Rolled Carbon Steel Flat Products from Argentina, India, Indonesia, Kazakhstan, the Netherlands, the People's Republic of China, Romania, South Africa, Taiwan, Thailand, and Ukraine, 65 Fed. Reg. 77,568, 77,568 (Dep't Commerce Dec. 12, 2000) (notice of initiation of antidumping duty investigations).  In general, these parties will be referred to as the "Domestic Producers."

[2]Defendant-Intervenors have not submitted comments on the Remand Determination.

[3]Familiarity with the Court's earlier opinion is presumed.

than fair value) ("Final Determ." or "Final Determination")).[4]  The remand order directed Commerce to reconsider aspects of the agency's final antidumping determination, specifically its affiliation determination, its use of Plaintiff's affiliate downstream sales data, and its adverse facts available determination.[5]  27 CIT at __, 264 F. Supp. 2d at 1366, 1372.  The

---

[4]Commerce's Final Determination incorporates by reference the agency's Issues and Decision Memorandum, which responds to CSC/YL's and the Domestic Producers' comments filed during the antidumping investigation.  Final Determ., 66 Fed. Reg. at 49,619; Dep't of Commerce Mem. from Joseph A. Spetrini, Deputy Assistant Sec'y Enforcement Group III, to Faryar Shirzad, Assistant Sec'y for Imp. Admin., Issues and Decision Memo for the Antidumping Investigation of Certain Hot-Rolled Carbon Steel Flat Products from Taiwan - October 1, 1999 through September 30, 2000, P.R. Doc. 151, Def.'s Ex. 8 (Sept. 21, 2001) ("Issues and Decision Mem.").
       Citations to the administrative record include references to both public documents ("P.R. Doc.") and proprietary documents ("C.R. Doc.").

[5]Prior to the preliminary determination, Commerce concluded that China Steel and Yieh Loong were affiliated under 19 U.S.C. § 1677(33)(E), and collapsed the two entities into a single producer pursuant to 19 C.F.R. § 351.401(f) (2001).  Dep't of Commerce Mem. from Patricia Tran, Case Analyst, to Joseph A. Spetrini, Deputy Assistant Sec'y Enforcement Group III, Antidumping Duty Investigation on Certain Hot-Rolled Carbon Steel Flat Products from Taiwan: Affiliation Issue regarding China Steel Corporation (China Steel) and Yieh Loong Enterprise Co., Ltd. (Yieh Loong), C.R. Doc. 51, Def.'s Conf. Ex. 5 at 2, 4 (Apr. 19, 2001); see also Certain Hot-Rolled Carbon Steel Flat Products from Taiwan, 66 Fed. Reg. 22,204, 22,206 (Dep't Commerce May 3, 2001) (notice of preliminary determination of sales at less than fair value).  As a result of those two determinations, Commerce calculated a single weighted-average dumping margin for Plaintiff.  Accordingly, the Court's use of "Plaintiff" or "CSC/YL" exclusively refers to the collapsed entity; all other references to the two corporations by their proper names shall refer only to the respective individual corporation.

Court also will review Plaintiff's corroboration issues, which were deferred in CSC/YL I.  27 CIT at __, 264 F. Supp. 2d at 1362 n.21.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2000).  For the reasons set forth below, the Court sustains Commerce's Remand Determination and the agency's corroboration determination.

## I. Standard of Review

This Court will uphold an agency determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## II. Discussion

There are four issues presented.  The Court must determine: (A) whether Commerce's affiliation determination is in accordance with law, (B) whether Commerce's determination that Plaintiff's home market sales to affiliates satisfy the five percent threshold required by its regulation, such that those sales should be used in calculating the dumping margin, is in accordance with law, (C) whether Commerce's application of adverse facts available is supported by substantial evidence and in accordance with law,[6] and

---

[6]In CSC/YL I, the Court also instructed the agency to reopen the record for further consideration of Plaintiff's warranty costs data requested orally by Commerce on May 3, 2001.  CSC/YL I, 27 CIT at __, 264 F. Supp. 2d at 1370.  Because both parties concede that this issue has been resolved on remand, the Court

(D) whether Commerce's corroboration determination is in accordance with law.

## A. Affiliation

In the Final Determination, Commerce treated Plaintiff as a single "collapsed" entity, and concluded that CSC/YL was affiliated with Yieh Hsing Enterprise Co., Ltd. ("YH"), Yieh Phui Enterprise Co., Ltd. ("YP"), and Persistence Hi-Tech Materials Inc. ("Persistence") pursuant to 19 U.S.C. § 1677(33)(F)-(G).[7] Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 6-7. Commerce made this conclusion because Yieh Loong, aware of the statutory definition of "affiliated parties," conceded affiliation with YH, YP, and Persistence in its section A questionnaire responses; Yieh Loong, YH, YP, and Persistence shared a common chairman of the board; Taiwanese law grants "extensive power" to chairmen of the board; and Yieh Loong, YH, and YP each own a minority stock interest in one another. Id.; Dep't of Commerce Mem. from Patricia Tran, Case Analyst, to File, Certain Hot-Rolled Carbon Steel Flat Products from Taiwan – China Steel Corporation (China Steel), Yieh Loong Enterprise (Yieh Loong), and affiliated resellers, C.R. Doc.

---

declines to address it here. Pl.'s Comments on Remand Decision at 10 n.4 ("This Court need do nothing as to warranty costs.") ("Pl.'s Comments"); see Remand Determ. at 11.

[7]This conclusion is referred to as Commerce's "affiliation determination."

50, Def.'s Conf. Ex. 4 at 2 (Apr. 19, 2001).   In reaching its conclusion, Commerce first found that Yieh Loong was affiliated with YH, YP, and Persistence.   Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 7.   Commerce then concluded that "China Steel [wa]s affiliated with Yieh Loong's affiliates," because "[c]ollapsed companies constitute a single entity and therefore affiliates of either company are affiliates of the collapsed entity."   See id. at 6-7.   The Court sustained the agency's affiliation determination as supported by substantial evidence, but remanded the decision for further consideration of the temporal aspect of the parties' relationships as required by the agency's regulation.   CSC/YL I, 264 F. Supp. 2d at 1354.

Affiliation is defined statutorily at 19 U.S.C. § 1677(33).[8]

---

[8]Title 19 U.S.C. § 1677(33) reads as follows:

The following persons shall be considered . . . "affiliated" or "affiliated persons":
    (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
    (B) Any officer or director of an organization and such organization.
    (C) Partners.
    (D) Employer and employee.
    (E) Any person directly or indirectly owning, controlling, or holding with power to vote, [five] percent or more of the outstanding voting stock or shares of any organization and such organization.
    (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
    (G) Any person who controls any other person and such other person.

Commerce also defines affiliation in its regulations at 19 C.F.R. § 351.102(b) (defining "[a]ffiliated person; affiliated parties" according to 19 U.S.C. § 1677(33)).  In rendering an affiliation determination, Commerce's regulation further requires the agency to "consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control."  19 C.F.R. § 351.102(b); see also Hontex Enters., Inc. v. United States, 27 CIT __, __, 248 F. Supp. 2d 1323, 1343 (2003).

The Court pronounced its understanding of the agency's temporal determination in Hontex Enters., Inc. v. United States, 27 CIT at __, 248 F. Supp. 2d at 1344 n.17, stating that "Commerce [is required to] weigh the nature of entities' contacts over time, and must determine how such contacts potentially impact each entity's business decisions.  Sporadic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control."  Id.  In promulgating regulations governing the agency's temporal determination, however, Commerce also explained that it may find control where the parties' relationship during the period of review is short-term or brief in

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C. § 1677(33).

duration.  <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg.

27,296, 27,298 (Dep't Commerce May 19, 1997) (final rule) ("<u>Final</u>

<u>Rule</u>").

> [T]he Department normally will not consider firms to be affiliated where the evidence of "control" is limited, for example, to a two-month contract.  On the other hand, the Department cannot rule out the possibility that a short-term relationship could result in control. Therefore, the Department will consider the temporal aspect of a relationship as one factor to consider in determining whether control exists.  In this regard, we also should note that we do not intend to ignore a control relationship that happens to terminate at the beginning (or comes into existence at the end) of a period of investigation or review.

<u>Id.</u>

On remand, Commerce characterized China Steel's relationship

with Yieh Loong as "extensive" and "long-term," rather than "short

term," "temporary," or "limited."  <u>Remand Determ.</u> at 2-3.  Commerce

decided that China Steel exercised "substantial" control over Yieh

Loong for the last seven months of the period of investigation

("POI") (October 1, 1999 through September 30, 2000), and

throughout the investigation itself (December 4, 2000 through April

23, 2001), for the following five reasons: (1) China Steel entered

into a stock-purchase agreement with Yieh Loong on December 17,

1999, Letter from Peter Koenig and Kristen Smith, Ablondi, Foster,

Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 31,

Pl.'s Conf. Ex. 4 at 3 (Mar. 20, 2001) ("CSC's Mar. 20 Response"),[9]

---

[9]Plaintiff's counsel changed affiliation from Ablondi, Foster, Sobin & Davidow, P.C., to Miller & Chevalier Chartered

(2) China Steel acquired a significant portion of Yieh Loong's equity on February 21, 2000, id. at 5; Remand Determ. at 3, (3) China Steel conceded that it "gained the management and operation right" for Yieh Loong, CSC's Mar. 20 Response, C.R. Doc. 31, Pl.'s Conf. Ex. 4 at 4, (4) China Steel shared two board members and a "supervisor" of Yieh Loong's board of directors, id., and (5) China Steel directed Yieh Loong's board of directors to appoint several of its own employees to high-ranking managerial positions at Yieh Loong, id. at Ex. A-25-C art. 1; see Remand Determ. at 2-3. Commerce therefore concluded that at the time the agency requested China Steel's downstream sales information, China Steel was in a position to obtain and submit downstream sales information from Yieh Loong for the entire POI. See id. at 3-4. Commerce also concluded that Plaintiff, as a collapsed entity, was in a position to compel Yieh Loong's affiliates to submit downstream sales data for the entire POI. See id.

Plaintiff makes two arguments challenging Commerce's temporal determination. First, Plaintiff asserts that it was not required to submit downstream sales information for Yieh Loong's affiliates until February 21, 2000, when China Steel became affiliated with Yieh Loong. See Pl.'s Comments at 8 (citing Pl.'s Br. Supp. Mot. J. Agency R. at 20) ("Pl.'s Br.")). Second, Plaintiff contends

---

prior to seeking judicial review of Commerce's affirmative less than fair value ("LTFV") determination with the Court.

that Yieh Loong was unable to compel its affiliates to produce the requested sales information when Commerce distributed its questionnaires because the common chairman between Yieh Loong, YP, and Persistence resigned from that position.  Pl.'s Comments at 3-4.  The Court finds both arguments unpersuasive.

As noted above, the agency's regulations require it to "consider" the temporal aspect of the affiliation relationship. The regulation's history clearly reveals that the duration of the parties' relationship is merely one factor the agency must consider in determining whether control exists.  Final Rule, 62 Fed. Reg. at 27,298.  Thus, while Commerce is required to examine the temporal aspect of the affiliation relationship, this factor is not in and of itself determinative.  The Court, nevertheless, must decide whether Commerce's temporal determination is supported by substantial evidence and in accordance with law.

The record clearly reveals that China Steel's and Yieh Loong's relationship was neither short nor temporary, as the parties' relationship formally commenced on December 17, 1999, CSC's Mar. 20 Response, C.R. Doc. 31, Pl.'s Conf. Ex. 4 at 3, and continued throughout the Department's investigation of the antidumping petition.  Importantly, China Steel gained substantial control over Yieh Loong's management and operation less than five months into the POI.  See id. at 5.  At this particular time, China Steel acquired a significant percentage of Yieh Loong's stock, which

resulted in the two companies sharing board members and a board supervisor.  Id.  China Steel contemporaneously directed Yieh Loong to appoint several of its former employees to high-ranking managerial positions.  Id. at A-25-C art. 1.  The record also reveals that China Steel increased its equity ownership in Yieh Loong during the last month of the POI.  Id. at 5.  Consequently, the record substantially supports Commerce's conclusion that China Steel maintained significant control over Yieh Loong for over seven months during the POI.  Moreover, Plaintiff does not contest that the two companies maintained this relationship after the POI and throughout the Department's investigation of the antidumping petition.

In light of this clear and substantial evidence of "control," it is also reasonable for the Department to conclude that China Steel could obtain and submit Yieh Loong's sales data.  See Ta Chen Stainless Steel Pipe, Inc. v. United States, 24 CIT 841, 844 (2000) (finding reasonable Commerce's conclusion that respondent's operational control of its U.S. affiliate gave respondent access to that affiliate's business records) ("Ta Chen I").  The Court therefore finds Commerce's determination that China Steel was in a position to obtain and submit downstream sales information from Yieh Loong for the entire POI supported by substantial evidence and in accordance with law.  In addition, once Commerce has appropriately determined that China Steel was affiliated with Yieh

Loong and collapsed them into a single entity, it follows that Plaintiff was required to submit downstream sales data for the entire POI, consistent with the antidumping statute and the applicable regulations, where the collapsed entity was in a position to compel the evidence from Yieh Loong's affiliates. See id.

Accordingly, Plaintiff's first argument, challenging Commerce's determination that CSC/YL was required to submit downstream sales data for sales to Yieh Loong's affiliates prior to February 21, 2001, fails. In CSC/YL I, Plaintiff conceded that the Department's affiliation determination with respect to Yieh Loong and China Steel was supported by substantial evidence and in accordance with law. See CSC/YL I, 27 CIT at __, 264 F. Supp. 2d at 1344 n.1. Plaintiff, nonetheless, challenged the temporal effect of that determination on its downstream sales submission requirements, because Plaintiff believed that China Steel and Yieh Loong, and in turn, Yieh Loong's affiliates, only became affiliated on February 21, 2000. 27 CIT at __, 264 F. Supp. 2d at 1350. Plaintiff again asserts this same argument on remand, citing five agency determinations for the proposition that respondents do not have to report pre-affiliation sales as affiliate sales. See Pl.'s Comments at 8 (citing Pl.'s Br. at 20). None of those determinations provide any support for Plaintiff's stated proposition. Consequently, Plaintiff's reliance on the five

determinations is misplaced. The Court therefore finds Plaintiff's first argument lacks merit.

Plaintiff's second contention is that Yieh Loong did not control its affiliates when Commerce distributed its questionnaires, because the common chairman between Yieh Loong, YP and Persistence resigned from that position in February 2001, thereby extinguishing Yieh Loong's ability to compel those specific affiliates to submit the requested information. Plaintiff's contention fails for two reasons.[10]

First, Commerce's affiliation determination does not rest solely on its findings concerning the common chairman. Supra p. 5. Instead, Commerce found, in addition to the common chairman, that Yieh Loong was affiliated with Persistence and YP because Yieh Loong, aware of the statutory definition of "affiliated parties," conceded affiliation with those two entities in its section A questionnaire responses, and Yieh Loong and YP each own a minority stock interest in one another. Id. While the fact that the common chairman resigned after Commerce distributed its January questionnaire may appear to cast doubt on the agency's decision,

---

[10]The record indicates that Commerce initially requested downstream sales data from Plaintiff on January 4, 2001. CSC/YL I, 27 CIT at ___, 264 F. Supp. 2d at 1345 (citation omitted). The agency subsequently requested that data two additional times on March 15, 2001 and April 17/18, 2001. 27 CIT at __, 264 F. Supp. 2d at 1346-47. It further indicates that the common chairman resigned from that position sometime during February 2001. Pl.'s Br. at 22.

the Court may not substitute its judgment for that of the agency. As Commerce ultimately bears the burden of weighing the evidence, the Court need only determine whether the Department's conclusions are substantially supported by the record. Corus Staal BV v. United States Dep't of Commerce, 27 CIT __, __, 259 F. Supp. 2d 1253, 1260 (2003). The Court found Commerce's affiliation determination, in its entirety, supported by substantial evidence in CSC/YL I. 27 CIT at __, 264 F. Supp. 2d at 1354. Accordingly, Plaintiff's attempts to confine Commerce's support for its affiliation determination to the common chairman are unpersuasive.

Second, and importantly, even though the common chairman resigned from that position, he remained a member of the three companies' board of directors; this fact further supports, rather than frustrates, Commerce's affiliation determination under the antidumping statute. Commerce relied on 19 U.S.C. § 1677(33)(F)-(G) to support that determination. Subsections (F) and (G) consider the following person(s) affiliated: "(F) [t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person[,]" or "(G) [a]ny person who controls any other person and such other person." 19 U.S.C. § 1677(33)(F)-(G). The statute further indicates that the "person" or "persons" "shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. §

1677(33); see also Uruguay Round Agreements Act, Statement of Administration Action, H.R. Doc. No. 103-316 at 838 ("SAA");[11] 19 C.F.R. § 351.102(b) (stating that Commerce is precluded from concluding that a person controls another unless their relationship "has the potential to impact decisions concerning the . . . pricing . . . of the subject merchandise"). The statute does not require that the "person" hold the position of chairman of the board. Rather, the "person" must be operationally in a position to exercise restraint or direction over the respective companies. As Plaintiff concedes that the former chairman remained a member of the three companies' board of directors, Case Brief of Yieh Loong and China Steel Corporation before the U.S. Dep't of Commerce, P.R. Doc. 140, Pl.'s Ex. 14 at 11 n.2 (Jun. 22, 2001); see Pl.'s Comments at 3, the former chairman's continuation as a board member, in the context presented here, satisfies this statutory requirement. Cf. Ta Chen Stainless Steel Pipe, Ltd. v. United States, 23 CIT 804, 813 (1999) ("The statute focuses on the capacity to control, rather than on the actual exercise of control.") (citing Ferro Union, Inc. v. United States, 23 CIT 178, 192, 44 F. Supp. 2d 1310, 1324 (1999)). Accordingly, Commerce's

---

[11]The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . . [T]he Administration understands that it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." SAA at 656.

conclusion that Yieh Loong was still in a position to compel its affiliates to submit the requested information at the time Commerce distributed its questionnaires is appropriately supported.

## B. Affiliate Home Market Sales

Commerce may calculate normal value[12] using sales by affiliated parties if those sales account for more than five percent of the respondent's home market sales. 19 C.F.R. § 351.403(d). Specifically, that subsection states that:

> [i]f an exporter or producer sold the foreign like product through an affiliated party, the [Department] may calculate normal value based on the sale by such affiliated party. However, the [agency] normally will not calculate normal value based on the sale by an affiliated party if sales of the foreign like product by an exporter or producer to affiliated parties account for less than five percent of the total value (or quantity) of the exporter's or producer's sales of the foreign like product in the market in question . . . .

19 C.F.R. § 351.403(d). Thus, Commerce has discretion to use a Plaintiff's affiliate resale data in calculating normal value if

---

[12]In conducting an antidumping duty investigation, Commerce is required to determine whether the imported merchandise at issue is sold or is likely to be sold in the United States at LTFV. See 19 U.S.C. § 1673. To determine whether merchandise is sold at LTFV, Commerce compares the price of the imported merchandise in the United States to the normal value for the same or similar merchandise in the home market. See 19 U.S.C. § 1677b(a). Normal value is defined as the comparable price for a product like the imported merchandise when first sold (generally, to unaffiliated parties) "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i).

CSC/YL's sales to affiliates constitute at least five percent of its total home market sales.  Id.

In the Final Determination, the Department determined, pursuant to 19 C.F.R. § 351.403(d), that Plaintiff's sales to Yieh Loong, YH, and YP constituted more than five percent of its home market sales, or a significant percentage.  See Final Determ., 66 Fed. Reg. at 49,621; Dep't of Commerce Mem. from Patricia Tran, Case Analyst, to File, The Use of Adverse Facts Available for China Steel Corporation (China Steel) and Yieh Loong Enterprise Co., Ltd. (Yieh Loong), C.R. Doc. 55, Def.'s Conf. Ex. 7 at 5 (Apr. 23, 2001).  As a result, Commerce determined that Plaintiff was required to submit its affiliates' downstream sales information for use in calculating its dumping margin.  See Final Determ., 66 Fed. Reg. at 49,621.  Because Commerce included Yieh Loong's own sales data in Plaintiff's total sales to affiliates calculation, however, the Court could not review Commerce's determination for compliance with the five percent threshold.  CSC/YL I, 27 CIT at __, 264 F. Supp. 2d at 1366.  Accordingly, the Court remanded the issue to the Department for further consideration.  Id.

On remand, Commerce concluded that Plaintiff's aggregate sales to affiliates significantly exceeded the five percent threshold required in the agency's regulations.  Remand Determ. at 9-10.  To make that determination, because China Steel and Yieh Loong were a single collapsed entity for purposes of calculating the dumping

margin, Commerce calculated the total home market sales for both China Steel and Yieh Loong separately and then added those two figures together to calculate Plaintiff's total home market sales. See id. The agency then reported the total amount of sales China Steel and Yieh Loong individually sold to each of their respective affiliates in the home market. Id. at 9. In particular, Commerce identified China Steel's sales to China Steel Global Trading, China Steel Chemical Corporation, YP, and YH. Id. Commerce also reported Yieh Loong's sales to its affiliates, including YH, YP, Lien Kang, Persistence, and China Steel Global Trading. Id. Commerce added those sales amounts together to calculate Plaintiff's total sales to affiliates. Id. at 10. The Department divided that amount by the two companies' total home market sales. See id. at 9-10. The result substantially exceeded the five percent threshold required by the agency's regulations. Id. at 10. The agency therefore concluded that it properly required CSC/YL to report all downstream sales data. Id.

Plaintiff argues that Commerce continues to miscalculate the extent of its affiliate resales, because the Department considers "pre-affiliation" sales by Plaintiff to YP, YH, and Persistence as sales to an affiliated party. Pl.'s Comments at 9. Accordingly, Plaintiff again contends that Commerce's determination on remand is

not in accordance with law.  <u>Id.</u> at 9-10.[13]

Substantial evidence supports Commerce's conclusion. Plaintiff's sales to affiliates significantly exceeded the five percent threshold required by the agency's regulation, and therefore, the Department's determination that Plaintiff produce all downstream sales information is in accordance with law.  The Court has reviewed the record evidence upon which Commerce relied in making its decision.  <u>Remand Determ.</u> at 9-10.  In particular, the Court examined the following sales data in the record: (1) Plaintiff's total home market sales data for both China Steel and Yieh Loong, Letter from Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 39 at Ex. B-17 (Apr. 3, 2001) ("CSC's Apr. 3 Response") (providing China Steel's total home market sales data); Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 12 at Ex. 1 (Feb. 2, 2001) (indicating Yieh Loong's total home market sales data), (2) China Steel's total sales to affiliates in the home market, which include sales to China Steel Global Trading Company, China Steel Chemical Corporation, YP, and

---

[13]As discussed above in subsection A, Commerce properly required Plaintiff to submit downstream sales data for the entire POI.  Plaintiff has not established that at the time of the agency's requests, CSC/YL, as a single collapsed entity, was not in a position to compel Yieh Loong's affiliates to submit the requested information.  Commerce therefore may use the downstream sales data from the entire POI to calculate Plaintiff's affiliated party sales.

YH, Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 52 at § A para. 1 (Apr. 23, 2001) ("CSC's Apr. 23 Response") (identifying China Steel's total sales to affiliates China Steel Global Trading Company and China Steel Chemical Corporation in the home market), Letter from Michael D. Panzera, Trial Attorney, U.S. Dep't of Justice, to Donald C. Pogue, Judge, U.S. Court of Int'l Trade, at 2-3, attach. 1-2 (Dec. 22, 2003) (identifying China Steel's total sales to affiliates YH and YP in the home market), and (3) Yieh Loong's total sales to its affiliates in the home market, including, YH, YP, Lien Kang, Persistence, and China Steel Global Trading, Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 12 at Ex. 2 (Feb. 2, 2001).  The Court then reviewed Commerce's computation outlined immediately above.  Therefore, the Court finds the record supports Commerce's determination that Plaintiff's sales to its affiliates in the home market significantly exceeded the five percent threshold required by the Department's regulation.  As such, Commerce's determination that Plaintiff was required to submit complete downstream sales data is in accordance with law.

### C. Adverse Facts Available

In its initial determination, Commerce applied adverse facts available, pursuant to 19 U.S.C. § 1677e(a)(2)(B), 1677e(b), to

calculate Plaintiff's dumping margin.  Final Determ., 66 Fed. Reg. at 49,620.  Commerce's decision to use adverse facts available was based on its finding that Plaintiff "failed to cooperate to the best of its ability" because China Steel repeatedly ignored instructions to submit complete product characteristics and accurate downstream sales data, and "never provided alternatives or reasonable explanations for why it could not report all downstream sales."  Id. at 49,622.

Commerce's finding, however, neglected to explain or analyze whether CSC/YL willfully decided not to cooperate or behaved below the standard of a reasonable respondent.  Rather, Commerce simply repeated its facts available reasoning to support its adverse facts available determination.  Consequently, the agency's determination was not in accordance with law.  27 CIT at __, 264 F. Supp. 2d at 1360.[14]  The Court also ordered Commerce to examine Plaintiff's contentions that it experienced difficulty in gathering and submitting the requested product characteristics and downstream sales data, and identify the agency's reasons for discounting Plaintiff's claims in making its "best of ability" determination,

---

[14]In light of the Federal Circuit Court of Appeals' recent decision in Nippon Steel Corp. v. United States, 337 F.3d 1373, 1383 (Fed. Cir. 2003) ("[S]ection 1677e(b) does not by its terms set a 'willfulness' . . . standard, nor does it require findings of motivation or intent.  Simply put, there is no mens rea component to the section 1677e(b) inquiry.") (emphasis supplied), the Court rescinds its order directing Commerce to find that the respondent acted willfully before imposing an adverse inference. 27 CIT at __, 264 F. Supp. 2d at 1372.

because Plaintiff's inability could render Commerce's determination unsupported by substantial evidence.  See CSC/YL I, 27 CIT at __, 264 F. Supp. 2d at 1360-61 (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citation omitted)).

On remand, Commerce again concluded that Plaintiff failed to act to the best of its ability.  See Remand Determ. at 5-8.  The agency found that Plaintiff submitted sales data containing significant deficiencies, rendering the sales data unuseable for calculating the dumping margin, failed to timely provide complete and accurate product characteristics and downstream sales information, established a pattern of unresponsiveness, and was capable of complying with its requests as evidenced by Plaintiff's assertion that the data were forthcoming.  Id. at 5-7.  Thus, Commerce determined that Plaintiff behaved below the standard for a reasonable respondent.  Id. at 5-6.

Specifically, Commerce concluded that Plaintiff behaved below the standard for a reasonable respondent by providing inconsistent and incomplete data and explanations in response to the agency's three questionnaires as well as requesting extensions of time to file complete responses, actions which indicated that the information was kept in CSC/YL's records and would be forthcoming. See id. at 6-7 (citing CSC's Apr. 3 Response, C.R. Doc. 39, Pl.'s Conf. Ex. 6 § A paras. 3 (seeking an extension of time to file the

"remaining" downstream sales information with Plaintiff's supplemental section D responses and further stating that "[i]t goes without mention, that all supporting information will be fully available for the Department's review and verification"), 4 (indicating that product characteristics such as "overrun, prime, carbon, yield strength etc. can be identified from the production record, inventory record as well as the product code system . . . while . . . paint, thickness, width, cut-to-length, pickled, edge trim and patterns in relief can be identified with customers' orders"), 5 (responding that "there is no record" of product characteristics for some leeway products because China Steel's internal system does not record products that were not produced in accordance with a customer's specifications); CSC's Apr. 23 Response, C.R. Doc. 52, Pl.'s Conf. Ex. 10 at 5-6 (stating that the records containing the product characteristics of leeway products are not "handy and available," and expressly requesting the opportunity "to refine the data submitted before . . . the final determination")).  Furthermore, Commerce held that Plaintiff's submission of the requested data thirty-eight days after the preliminary result also indicated behavior below the standard for a reasonable respondent.  Remand Determ. at 6.  The Department therefore concluded that the record contained substantial evidence to support the application of an adverse inference.  Id. at 8.

Commerce made two additional findings.  First, with respect to

the product characteristics data, because Plaintiff was given ample opportunity to respond to the Department's requests, and provided inconsistent and inaccurate responses, Commerce found that Plaintiff was not excused from providing complete and accurate responses even though CSC/YL was unable to retrieve the requested information in a timely manner.  See Remand Determ. at 7 (citing Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 CIT __, __, 178 F. Supp. 2d 1305, 1332 (2001) (stating Commerce's proposition there that "plaintiff's lack of advanced computer capabilities does not 'entitle[] them to underreport and affirmatively misstate [facts] during a review.'")).  Second, the Department concluded that "Yieh Loong [wa]s in a position to compel [its affiliates] to provide a response to the Department's questionnaire" as a result of the agency's conclusion to collapse Yieh Loong and China Steel, and its finding that Yieh Loong was affiliated with YH, YP, and Persistence, and Yieh Loong with China Steel.  Remand Determ. at 7.

Plaintiff contests the Department's decision on three separate grounds.  First, Plaintiff claims that before drawing an adverse inference, Commerce is required to cite evidence demonstrating that CSC/YL could have provided the requested information earlier than when it was actually produced.  See Pl.'s Comments at 1.  Second, Plaintiff argues that the agency again failed to address the difficulties it experienced in gathering and submitting the

requested data in accordance with the Court's order.  See Pl.'s
Comments at 2.  Third, Plaintiff continues to argue, as in CSC/YL
I, that an adverse inference is inappropriate here with respect to
the downstream sales information because Plaintiff did not have
control or leverage over Yieh Loong's affiliates to compel their
responses to the Department's requests.  See Pl.'s Comments at 4;
see Pl.'s Br. at 21-22.  Plaintiff's arguments lack merit.

The antidumping statute grants Commerce discretion to
determine whether the respondent in an investigation has "failed to
cooperate by not acting to the best of its ability to comply with
a request for information."  19 U.S.C. § 1677e(b).[15]  After the
Court's first decision in this matter, the Federal Circuit Court of
Appeals explained the "best of ability" standard in Nippon Steel

---

[15]Title 19 U.S.C. § 1677e(b) provides:

If [Commerce] . . . finds that an interested party has
failed to cooperate by not acting to the best of its
ability to comply with a request for information from
[Commerce] . . ., the [agency] . . . in reaching the
applicable determination under this subtitle, may use
an inference that is adverse to the interests of that
party in selecting from among the facts otherwise
available.  Such adverse inference may include reliance
on information derived from–
        (1) the petition,
        (2) a final determination in the investigation
under this subtitle,
        (3) any previous review under section 1675 of this
title or determination under section 1675b of this
title, or
        (4) any other information placed on the record.

19 U.S.C. § 1677e(b).

Corp., 337 F.3d at 1381-84.[16]  "Compliance with the 'best of its ability' standard is determined by assessing whether the respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquires in an investigation."  Id. at 1382.  In other words, a respondent satisfies the statutory mandate to act to the best of its ability when the respondent does "the maximum it is able to do" in meeting Commerce's requests for information.  Id.

To determine whether a respondent has not cooperated to the best of its ability and draw an adverse inference under § 1677e(b), Commerce must make two findings.  Id. at 1382.  The agency must decide objectively whether a reasonable importer would have known that the requested information was required to be kept and maintained under the antidumping statute.  Id.  Second, Commerce must determine whether this particular importer not only failed to timely produce the requested information, but that the importer's failure to respond resulted from either the importer's failure to keep and maintain the requested information or to put forth its maximum efforts to locate and acquire the requested information from its records.  Id. at 1382-83.  The Federal Circuit stated the

---

[16]Although a U.S. importer was the subject of the Federal Circuit's "best of ability" analysis, nothing in that decision precludes the Court from applying its reasoning to a Taiwanese exporter.  Shandong Huarong Gen. Group Corp. v. United States, slip. op. 03-135 at 35 n.18 (CIT Oct. 22, 2003) (extending the Federal Circuit's "best of ability" analysis to an exporter from the People's Republic of China).

two required findings as follows:

> First, it must make an objective showing that a
> reasonable and responsible importer would have known that
> the requested information was required to be kept and
> maintained under the applicable statutes, rules, and
> regulations. Second, Commerce must then make a
> subjective showing that the respondent under
> investigation not only has failed to promptly produce the
> requested information, but further that the failure to
> fully respond is the result of the respondent's lack of
> cooperation in either: (a) failing to keep and maintain
> all required records, or (b) failing to put forth its
> maximum efforts to investigate and obtain the requested
> information from its records.

Id. (internal citation omitted). The Federal Circuit also limited

the Department's ability to properly draw an adverse inference.

Commerce may only draw an adverse inference where the agency can

reasonably expect that the respondent should have provided more

information in its responses. Id. at 1383.

> An adverse inference may not be drawn merely from a
> failure to respond, but only under circumstances in which
> it is reasonable for Commerce to expect that more
> forthcoming responses should have been made; i.e., under
> circumstances in which it is reasonable to conclude that
> less than full cooperation has been shown.

Id.

Commerce's remand conclusion here complies with this mandate.

First, with respect to the product characteristics data, Commerce,

initially, asked Plaintiff to produce that data for all products.

See Letter from Robert James, Program Manager, Int'l Trade Admin.,

to China Steel Corporation, P.R. Doc. 28 at B-6 to B-11 (Jan. 4,

2001). Plaintiff failed to provide a complete response. Commerce

then again asked for product characteristics data on March 15,

2001, Final Determ., 66 Fed. Reg. at 49,620; to which Plaintiff inconsistently responded that the information was obtainable from its records, but some leeway products were not recorded in its system. CSC's Apr. 3 Response, C.R. Doc. 39, Pl.'s Conf. Ex. 6 § A paras. 4-5. Finally, the agency sent a third request ordering Plaintiff to fully report the product characteristics of leeway and overrun merchandise. Final Determ., 66 Fed. Reg. at 49,620; Letter Robert James, Program Manager, Int'l Trade Admin., to China Steel Corporation, c/o Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., P.R. Doc. 99 at 1 (Apr. 17, 2001). In response, Plaintiff stated that the product characteristics of leeway merchandise were not handy or available. CSC's Apr. 23 Response, C.R. Doc. 52, Pl.'s Conf. Ex. 10 at 5. Plaintiff also requested additional time to refine the product characteristics data and submit additional information before the Department's final decision. Id. at 6. Plaintiff, however, failed to submit complete product characteristics data in a timely manner.

Plaintiff also failed to completely and accurately respond to Commerce's request for affiliated downstream sales information. Commerce initially requested that Plaintiff produce affiliated downstream sales information if total sales to affiliates constituted more than five percent of all home market sales. Final Determ., 66 Fed. Reg. at 49,621. Plaintiff requested that Commerce excuse it from production of this information, as

Plaintiff believed that its affiliate sales were below the required percentage. Id. Ten days later, Commerce denied Plaintiff's request and again sought all Plaintiff's affiliate sales information. Id. The agency subsequently repeated that request twice. Id. at 49,620. Plaintiff responded that its affiliates "could not provide complete and adequate data to match [its] records within the Department's deadlines." CSC's Apr. 3 Response, C.R. Doc. 39, Pl.'s Conf. Ex. 6 § A para. 3. CSC's Apr. 3 Response also requested an extension of time to provide the remaining information, insisting that the requested information would be available before verification. Id. Plaintiff, however, failed to timely produce complete downstream sales data.

In response to the Court's remand order, Commerce set forth its opinion as to what efforts Plaintiff could have put forth to comply with the "best of its ability" standard and concluded that Plaintiff did not meet that standard. It appears Commerce concludes that a responsible and reasonable respondent would have known that the product characteristics and downstream sales data were required to be kept and maintained in accordance with the statute, rules and regulations in light of the agency's repeated requests for complete and accurate submissions. See Remand Determ. at 6-7 (concluding that Plaintiff behaved below the standard of a reasonable respondent because "[t]he Department on numerous occasions requested the physical characteristics of all subject

merchandise" and despite Plaintiff's computer difficulties, Plaintiff's "inability to retrieve the requested information within the deadlines d[id] not excuse [it] from providing complete and accurate information"). In fact, the record reveals that Plaintiff maintained the requested data and eventually, albeit untimely, produced information, which purportedly contained the deficient downstream sales and product characteristics data. Accordingly, the Court finds that Commerce made the requisite objective showing that a reasonable and responsible importer would have known that the requested data was required to be kept and maintained under the applicable statutes, rules, and regulations.

Commerce also made the requisite second showing, although as in Nippon Steel Corp., 337 F.3d at 1384, the Department here framed its response as an objective inquiry. Commerce's Remand Determination concludes that Plaintiff was capable of providing the requested information, but failed to accurately, completely, and timely respond to the agency's requests. Remand Determ. at 6-7; Shandong Huarong Gen. Grp. Corp. v. United States, slip op. 03-135 at 36 (finding that plaintiffs did not put forth their maximum efforts to produce the sales records requested because plaintiffs submitted inaccurate responses). To support that conclusion, the agency cites record evidence referencing Plaintiff's repeated statements that the requested information would be forthcoming. See Remand Determ. at 6-7. For example, Commerce cites Plaintiff's

response stating that the downstream sales information would be available for the Department's review prior to verification, id. at 7, which was scheduled to commence for Yieh Loong and China Steel on April 30, 2001 and May 7, 2001 respectively. Letter from Neal Halper, Director, Office of Accounting, Int'l Trade Admin., to Peter Koenig, Ablond[i], Foster, Sobin & Davidow, P.C., C.R. Doc. 49 at 1 (Apr. 19, 2001); Letter from Neal M. Halper, Director, Office of Accounting, Int'l Trade Admin., to Peter Koenig, Ablondi, Foster, Sobin & Davidow, P.C., C.R. Doc. 56 at 1 (Apr. 26, 2001). Plaintiff, however, allegedly submitted complete downstream sales data on May 30-31, 2001, Pl.'s Br. at 25; Commerce found that submission untimely, Final Determ., 66 Fed. Reg. at 49,620, which finding the Court sustained in CSC/YL I. 27 CIT at __, 264 F. Supp. 2d at 1369. Such evidence supports Commerce's determination that CSC/YL was capable of providing the requested information, but failed to make a timely and complete response. Moreover, Commerce's conclusion is consistent with the Court's holding in CSC/YL I that the record supported Commerce's determination that Plaintiff was capable of providing the requested data. See 27 CIT at __, 264 F. Supp. 2d at 1360. Thus, the Court finds that Commerce properly made the second finding.

As Commerce demonstrated that Plaintiff failed to cooperate to the best of its ability and that factual finding is supported by substantial evidence, the Court finds Commerce properly concluded

that Plaintiff failed to act to the best of its ability. Commerce's decision to apply an adverse inference in calculating the dumping margin here is therefore in accordance with law.

Contrary to Plaintiff's first argument, Commerce was not required to cite substantial evidence indicating that Plaintiff could have provided the requested information earlier than when it was actually produced. Neither the statute nor the agency's regulations require Commerce to make such a finding. Indeed, it is Plaintiff who ultimately bears the burden of creating an accurate record in an antidumping duty investigation. Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("Ta Chen II") (quoting Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production [belongs] to the party in possession of the necessary information.")). As Plaintiff failed to produce the requested information in a timely manner, Plaintiff also has failed to meet its burden of production. Therefore, the Court finds Plaintiff's first argument fails.

Plaintiff's second argument, contending that the agency failed to address the difficulties it experienced in gathering and submitting the requested information in accordance with the Court's order in CSC/YL I, also fails. There, the Court ordered the Department to "'examine the relevant data and articulate a satisfactory explanation'" identifying the agency's "'reasons for

discounting Plaintiff's claims.'" <u>See</u> 27 CIT at __, 264 F. Supp. 2d at 1361 (quoting <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43). Commerce has satisfied the Court's order on remand.

In the <u>Remand Determination</u>, Commerce specifically relied on particular questionnaire responses which directly describe the difficulties Plaintiff encountered in gathering and submitting the requested data to make its "best of ability" determination. <u>E.g.</u>, <u>See Remand Determ.</u> at 6-7 (citing CSC's Apr. 3 Response, C.R. Doc. 39, Pl.'s Conf. Ex. 6 § A para. 3 (describing Plaintiff's difficulty gathering and submitting information from YH and YP), para. 5 (responding that "there may be chances that there is (sic) no record" of product characteristics for some leeway products because China Steel's internal system does not record products that were not produced in accordance with a customer's specifications); CSC's Apr. 23 Response, C.R. Doc. 52, Pl.'s Conf. Ex. 10 at 5-6 (stating that "the order record behind leeway may be voluminous;" that old orders are placed on tapes and require writing a specific program to retrieve data in the database; that China Steel "has already tried very hard to trace back the properties of leeway" and employees "have been . . . tracing more than [ten] databases with tapes back to 1994" to locate the requested product characteristics data)).

Although Commerce's reasons for discounting Plaintiff's claims

are not drawn with ideal clarity, the Remand Determination responds to those claims.  See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (holding that courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (citation omitted).  With respect to the product characteristics data, because Plaintiff was given "ample" opportunity to respond to the Department's requests, and provided inconsistent and incomplete responses, Commerce found that Plaintiff was not excused from providing complete and accurate responses.  See Remand Determ. at 7 (citing Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 CIT at __, 178 F. Supp. 2d at 1332 (stating Commerce's proposition there that "plaintiff's lack of advanced computer capabilities does not 'entitle[] them to underreport and affirmatively misstate [facts] during a review.'")).  Because Plaintiff ultimately bears the burden of creating an accurate record, Ta Chen II, 298 F.3d at 1336 (citing Zenith Elecs. Corp. v. United States, 988 F.2d at 1583), because Commerce granted Plaintiff almost four months to produce the requested information, and because Plaintiff assured Commerce that the data would be forthcoming, Plaintiff had the opportunity and ability to submit complete and accurate responses.  Therefore, with respect to the product characteristics data, Commerce has provided a satisfactory explanation for discounting Plaintiff's claims.

The Department also found that "Yieh Loong [wa]s in a position

to compel [its affiliates] to provide a response to the Department's questionnaire," as a result of the agency's conclusion to collapse China Steel and Yieh Loong, and its decision that Yieh Loong is affiliated with YH, YP, and Persistence. <u>Remand Determ.</u> at 7.  It can reasonably be inferred from this statement that Commerce was responding to Plaintiff's claim that China Steel was unable to compel YH and YP to submit downstream sales data. Because the Court sustained Commerce's determination that China Steel was in a position to compel the downstream sales data from Yieh Loong's affiliates by virtue of that company's collapse with Yieh Loong above in subsection A, Commerce's statement concerning the downstream sales information articulates a satisfactory explanation for discounting Plaintiff's claims.

As Commerce ultimately bears the responsibility of weighing the evidence, the Court may not substitute its judgment for that of the agency.  <u>See</u> <u>Corus Staal BV v. United States</u>, 27 CIT at __, 259 F. Supp. 2d at 1260.  Even if there is some evidence which detracts from the agency's conclusions, the Court need only determine whether the Department's conclusions are substantially supported by the record.  <u>Id.</u>; <u>Olympia Indus., Inc. v. United States</u>, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998) (citing <u>Atl. Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1563 (Fed. Cir. 1984)).  Because the Court found Commerce's "best of ability" determination supported by substantial evidence above, the Court finds that

Commerce properly articulated a satisfactory explanation for discounting Plaintiff's claims.

Finally, the Court finds unpersuasive Plaintiff's third argument that an adverse inference is inappropriate with respect to the downstream sales data because Plaintiff lacks control over Yieh Loong's affiliates to compel their responses. In the instant case, contrary to Plaintiff's claim, Commerce determined on remand that Plaintiff, as a collapsed entity, was in a position to compel Yieh Loong's affiliates to submit downstream sales data for the entire POI. See Remand Determ. at 3-4, 7 (concluding that "Yieh Loong [wa]s in a position to compel [its affiliates] to provide a response to the Department's questionnaire" as a result of the agency's finding that Yieh Loong was affiliated with YH, YP, and Persistence, and the agency's collapsing of Yieh Loong with China Steel). The Court sustained that determination in subsection A above, concluding that as a consequence of the control China Steel maintained over Yieh Loong, the agency collapsing China Steel and Yieh Loong into a single entity, and Yieh Loong's affiliation with YH, YP, and Persistence, Plaintiff was in a position to compel the downstream sales information from Yieh Loong's affiliates. Supra pp. 10-12. Thus, the burden was on Plaintiff to show that it could not compel Yieh Loong's affiliates to provide the requested information. CSC/YL has failed to meet that burden.[17]

_____

[17]Commerce has, however, refrained from applying adverse facts available where the respondent could establish that it

Similar to Ta Chen I, 24 CIT at 845, Plaintiff here simply called and forwarded the Department's questionnaire to YH. Letter from Peter Koenig and Kristen Smith, Ablondi, Foster, Sobin & Davidow, P.C., to U.S. Sec'y of Commerce, C.R. Doc. 43, Pl.'s Conf. Ex. 8 at 2-3 (Apr. 10, 2001) (stating that China Steel "called [YH] . . . for assistance and passed on . . . the Department['s] request"). Plaintiff subsequently called YH again to urge that company's cooperation. Id. The record does not reveal any other efforts Plaintiff undertook to acquire the requested information

---

attempted to acquire the requested information, but was unable to compel its affiliate to produce that information. E.g., Roller Chain, Other than Bicycle, from Japan, 62 Fed. Reg. 60,472, 60,476 (Dep't Commerce Nov. 17, 1997) (notice of final results and partial recission of antidumping duty administrative review) (concluding that it was inappropriate to apply adverse facts available where despite respondent's efforts to acquire the requested information, "it was not in a position to compel the affiliated customer to produce the information requested by the Department"); Certain Fresh Cut Flowers from Colombia, 63 Fed. Reg. 5,354, 5,356 (Dep't Commerce Feb. 2, 1998) (notice of preliminary results and partial termination of antidumping duty administrative review) (choosing not to apply an adverse inference where respondent's "exhaustive efforts at locating [the requested information from an affiliate] . . . were futile."); Certain Cut-to-Length Carbon Steel Plate from Brazil, 63 Fed. Reg. 12,744, 12,751 (Dep't Commerce Mar. 16, 1998) (notice of final results of antidumping duty administrative review) (concluding that the application of an adverse inference was inappropriate where respondent "did attempt to obtain . . . information from its affiliate" and where the nature of the parties' affiliation was such that respondent could not compel affiliate to provide the information); see also Certain Cut-to-Length Carbon Steel Plate from Belgium, 63 Fed. Reg. 2,959, 2,961 (Dep't Commerce Jan. 20, 1998) (notice of final results of antidumping duty administrative review) (stating that the agency "may resort to adverse facts available in response to [respondent's] failure to report [information from an affiliate] unless [respondent] establishes that it could not compel its affiliate to report [the information].") (citation omitted).

from YH, nor is there any record evidence demonstrating the specific efforts Plaintiff took to compel the requested information from YP and Persistence, the two other Yieh Loong affiliates. Such actions do not demonstrate an inability to compel a response from Yieh Loong's affiliates. See Ta Chen I, 24 CIT at 845 (citing Kawasaki Steel Corp. v. United States, 24 CIT 684, 694, 110 F. Supp. 2d 1029, 1039 (2000) (finding that respondent's letters and oral requests for information from affiliate were insufficient to show respondent cooperated to the best of its ability because respondent simply acquiesced in affiliate's refusal to provide information). Thus, the Court finds Plaintiff's third argument lacks merit, as Plaintiff has failed to show that it could not to compel Yieh Loong's affiliates to produce the requested downstream sales information.

## D. Corroboration

Title 19 U.S.C. § 1677e(c) requires that Commerce corroborate any adverse facts selected to calculate a dumping margin. In the Final Determination, Commerce used the 29.14 percent facts available dumping margin proposed in the Domestic Producers' antidumping petition. See Issues and Decision Mem., P.R. Doc. 151, Def.'s Ex. 8 at 14.[18] Commerce selected this petition rate because

---

[18]Commerce also noted that it was unable to corroborate the Domestic Producers' proposed adverse facts available rate of 87.06 percent. Issues and Decision Mem., P.R. Doc. 151, Def.'s

it was the highest computed margin covering the subject merchandise under the Harmonized Tariff Schedule.  Id.  The rate resulted from a margin computation employing constructed value ("CV") as the normal value.[19]  Id.  In calculating CV, the Domestic Producers used their own cost of manufacturing ("COM") data.  Id.  Because "the Department knew of no sources to [directly] corroborate [the Domestic Producers'] reported COM data," Commerce compared that data with Plaintiff's COM data.  Id.  Commerce concluded that the COM data submitted by Plaintiff was "reasonably close" to that submitted by the Domestic Producers.  Id.  As such, Commerce found the COM data, and in turn, the 29.14 margin rate contained in the petition, sufficiently corroborated.  Id.  The Department concluded that the 29.14 percent margin was adverse because "it reasonably insures that [Plaintiff] does not benefit from its own lack of cooperation."  Id.

Plaintiff asserts two arguments challenging Commerce's corroboration determination as not in accordance with law.  First, Plaintiff claims that Commerce applied a new standard of law in corroborating the dumping margin.  Because Commerce first determined that CSC/YL's COM data was "reasonably close" to the COM data the Domestic Producers submitted, without defining or

_____

Ex. 8 at 14.

[19]Constructed value is calculated according to 19 U.S.C. § 1677b(e).

explaining that standard, and then concluded that the petition

dumping margin was sufficiently corroborated, Plaintiff claims

Commerce's corroboration determination is not in accordance with

law.  See Pl.'s Br. at 31.  Second, Plaintiff claims Commerce's

conclusion that the two sets of data were "reasonably close" is not

in accordance with law, because an 8.6 percent difference exists

between the two sets of data.  See Pl.'s Reply to Opp'n to Pl.'s

Mot. J. Agency R. at 22 ("Pl.'s Reply").  Plaintiff relies on 19

U.S.C. § 1677f-1(a)(2) and 19 C.F.R. § 351.413 to support its

argument.  Id.[20]  Plaintiff claims that an 8.6 percent difference

is too great to be "insignificant" and therefore Commerce's use of

its data to corroborate the Domestic Producer's COM data is

prohibited.  See id.

In response, Commerce argues that the agency properly

corroborated the secondary information used as adverse facts

available because Commerce used Plaintiff's own COM data.  Def.'s

Mem. in Opp'n to Pl.'s Mot. J. Agency R. at 41-42 (citing Ta Chen

II, 298 F.3d at 13[40]).  Defendant Intervenor II adds that the

exhaustion doctrine precludes the Court's review of Plaintiff's

---

[20]Title 19 U.S.C. § 1677f-1(a)(2) states that "[f]or
purposes of determining . . . normal value under section 1677b .
. . [Commerce] may . . . decline to take into account adjustments
which are insignificant in relation to the price or value of the
merchandise.  Id.  Section 351.413 of the agency's regulations
defines the term "insignificant adjustment" as "any individual
adjustment having an ad valorem effect of less than 0.33
percent."  19 C.F.R. § 351.413 (emphasis supplied).

corroboration claims.  Def.-Int. II's Br. Opp'n to Pl.'s Mot. J.

Agency R. at 22 n.6.  The Court will address the latter argument

first.

"The exhaustion doctrine requires a party to present its

claims to the relevant administrative agency for the agency's

consideration before raising these claims to the Court."  Timken

Co. v. United States, 26 CIT __, __, 201 F. Supp. 2d 1316, 1340

(2002) (citation omitted).  "There is, however, no absolute

requirement of exhaustion in the Court of International Trade in

non-classification cases."  Consol. Bearings Co. v. United States,

25 CIT __, __, 166 F. Supp. 2d 580, 586 (2001) (citation omitted).

Rather, Congress vested the Court with discretion to determine the

circumstances under which it is appropriate to require the

exhaustion of administrative remedies pursuant to 28 U.S.C. §

2637(d).[21]

"Concomitant with the request for values of judicial economy

and 'administrative autonomy' inherent in the application of the

exhaustion doctrine, McKart v. United States, 395 U.S. 185, 194

(1969) (citation omitted), lies a responsibility for the agency,

necessarily vested with control over the administrative

proceedings, to allow a sufficient opportunity to raise issues."

Al Tech Specialty Steel Corp. v. United States, 11 CIT 372, 377,

---

[21]Title 28 § 2637(d) states that "the Court of International
Trade shall, where appropriate, require the exhaustion of
administrative remedies."  Id.

661 F. Supp. 1206, 1210 (1987). "Thus, in determining whether questions are precluded from consideration on appeal, the Court will assess the practical ability of a party to have its arguments considered by the administrative body." Id. (citations omitted). For example, in Philipp Bros., Inc. v. United States, 10 CIT 76, 83-84, 630 F. Supp. 1317, 1324 (1986), the Court held that because Commerce did not address the issue challenged for judicial review until the final decision, plaintiff was not afforded the opportunity to raise its objections at the administrative level. Accordingly, the Philipp Bros., Inc. Court concluded that the exhaustion doctrine did not preclude judicial review of the matter presented for the first time. See 10 CIT at 84, 630 F. Supp. at 1324; see also LTV Steel Co. v. United States, 21 CIT 838, 869, 985 F. Supp. 95, 120 (1997) (finding that the exhaustion doctrine did not preclude judicial review of respondent's claim where respondent did not have the opportunity to challenge the methodology used by Commerce to countervail a worker assistance program because Commerce failed to articulate the methodology it would use until the final determination); SKF USA, Inc. v. United States Dep't of Commerce, 15 CIT 152, 159 n.6, 762 F. Supp. 344, 350 n.6 (1991) (finding the exhaustion doctrine inapplicable because respondent did not have an opportunity to contest Commerce's recalculation of foreign market value of respondent's ball bearings, as the agency did not reveal the results of the recalculation until the final

determination); Am. Permac, Inc. v. United States, 10 CIT 535, 536 n.2, 642 F. Supp. 1187, 1188 n.2 (1986) (noting that the imposition of the exhaustion doctrine would be inappropriate because the issue did not arise until long after the comment period for the preliminary results, and because Commerce could issue its final decision at any time; as such, it was unclear whether plaintiffs had a "definite" opportunity to raise their objection before Commerce.) (citations omitted).

Here, Commerce's statement that Plaintiff's COM data was reasonably close to the evidence submitted by the Domestic Producers was first pronounced in the agency's Final Determination. Plaintiff did not have the opportunity to present its objections to that statement at the administrative level. Moreover, it is clear that Plaintiff has not prematurely resorted to the Court, as all administrative remedies are now closed to Plaintiff. McKart v. United States, 395 U.S. at 196-97. Accordingly, the exhaustion doctrine does not preclude judicial review of Plaintiff's corroboration objections here, which objections the Court will now discuss.

Where Commerce has demonstrated that it may properly apply an adverse inference to determine the dumping margin, Commerce may rely on secondary information from the petition, the final determination, a previous review or any other information placed on the record. 19 U.S.C. § 1677e(b). "When the [Department] . . .

relies on secondary information rather than on information obtained in the course of an investigation or review, the [agency] . . . shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal." 19 U.S.C. § 1677e(c); see also 19 C.F.R. § 351.308(d) (same). To "corroborate" means that "the [Department] will examine whether the secondary information to be used has probative value." 19 C.F.R. § 351.308(d). The agency may examine, but is not limited to, the following "independent sources" in corroborating secondary information: "published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review." Id.

To comply with the statute, "Commerce must assure itself that the [dumping] margin it applies is [not] [ir]relevant . . . or lacking a rational relationship" to the evidence presented in the record. Ferro Union, Inc. v. United States, 23 CIT 178, 205, 44 F. Supp. 2d 1310, 1335 (1999) (holding that Commerce cannot apply a margin that has been discredited). Commerce has broad, but not unbounded, discretion in determining what would be an accurate and reasonable dumping margin where a respondent has been found uncooperative. F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d, 1027, 1032 (Fed. Cir. 2000) ("Particularly in the case of an uncooperative respondent, Commerce is in the best position, based on its expert knowledge of the market and the

individual respondent to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin.  Commerce's discretion in these matters, however, is not unbounded.") ("De Cecco")).  Commerce cannot "'overreach reality'" when calculating a dumping margin, in that the rate must be a "'reasonably accurate estimate of the [plaintiff's] actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'"  See Ta Chen II, 298 F.3d at 1340 (quoting De Cecco, 216 F.3d at 1032).  Put differently, the agency cannot impose "punitive, aberrational, or uncorroborated margins."  De Cecco, 216 F.3d at 1032 (citation omitted).  The Court now reviews Plaintiff's arguments in light of these legal standards.

Contrary to Plaintiff's first argument, Commerce did not establish a new legal standard in corroborating the Domestic Producers' COM data with Plaintiff's COM data.  Rather, it appears that Commerce made a factual conclusion that the Domestic Producers' COM data was rationally related to that provided by Plaintiff and therefore sufficiently corroborated.  See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. at 286 (holding that courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (citation omitted).  Commerce is permitted to make such factual determinations in corroborating dumping margins.  See De Cecco, 216

F.3d at 1032 ("Commerce[] [has] discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative."); see also Corus Staal BV v. United States, 27 CIT at __, 259 F. Supp. 2d at 1260 (concluding that Commerce ultimately bears the responsibility of weighing the evidence). As Plaintiff failed to cooperate with the Department's requests for information, Commerce was permitted to rely on the petition margin, which used the COM data submitted by the Domestic Producers, to support its adverse facts available dumping margin. 19 U.S.C. § 1677e(b). Commerce also properly corroborated the Domestic Producers' COM data with Plaintiff's own COM data. See Ta Chen II, 298 F.3d at 1340 (upholding Commerce's selection of a dumping margin for an uncooperative respondent where the margin was corroborated by the respondent's own sales data); 19 C.F.R. § 351.308(d) (stating that Commerce may examine information obtained from interested parties during the instant investigation to corroborate secondary information). Commerce's corroboration determination is therefore in accordance with law.

The Court finds unpersuasive Plaintiff's second argument that Commerce's "reasonably close" determination is not in accordance with law because there is an 8.6 percent difference between the two data sets. Plaintiff relies on 19 U.S.C. § 1677f-1(a)(2) and 19 C.F.R. § 351.413 to support its argument. Those two provisions grant Commerce discretion to consider price or value adjustments to

merchandise in calculating normal value under § 1677b.  Supra note 20.  Neither provision requires Commerce to make only insignificant "adjustments" while corroborating antidumping margins.  Moreover, neither provision requires Commerce to apply or consider the regulation's prescribed percentage rate in its corroboration determination.  Plaintiff's reliance on those two provisions is therefore misplaced.  As Plaintiff has failed to present any other support for its second contention, Commerce's determination that the COM data produced by Plaintiff was reasonably close to that provided by the Domestic Producers is in accordance with law.

## III. Conclusion

For the reasons stated above, Commerce's Remand Determination in CSC/YL I, 27 CIT at __, 264 F. Supp. 2d at 1339, is affirmed in its entirety.  The Court also sustains Commerce's corroboration determination.

/s/ Donald C. Pogue

Judge

Dated:     January 26, 2004
           New York, New York