**Slip Op. 08 – 134**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

PEER BEARING COMPANY –
CHANGSHAN,

                Plaintiff,

                v.

UNITED STATES,

                Defendant,

                and

THE TIMKEN COMPANY,

                Defendant-
                Intervenor.

</td><td>

Before: Richard W. Goldberg,
       Senior Judge

Court No.  07-00373

</td></tr>
</table>

**OPINION**

[Commerce's final antidumping duty administrative review
determination is sustained.]

Dated: December 8, 2008

Arent Fox PLLC (John J. Gurley, Nancy A. Noonan, and Diana
Dimitriuc Quaia) for Plaintiff Peer Bearing Company - Changshan.

Gregory G. Katsas, Assistant Attorney General; Jeanne E.
Davidson, Director, Patricia M. McCarthy, Assistant Director,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (Jane C. Dempsey); Office of the Chief Counsel for
Import Administration, U.S. Department of Commerce (Ahran Kang),
Of Counsel, for Defendant United States.

Stewart and Stewart (Terence P. Stewart, William A. Fennell, and
Wesley K. Caine) for Defendant-Intervenor The Timken Company.

**GOLDBERG, Senior Judge**:  In this action, plaintiff Peer Bearing

Company – Changshan ("CPZ"), a Chinese producer of tapered

roller bearings, challenges the decision of the International

Trade Administration of the United States Department of Commerce

("Commerce") in Tapered Roller Bearings and Parts Thereof,

Finished or Unfinished, from the People's Republic of China:

Final Results of 2005-2006 Administrative Review and Partial

Rescission of Review, 72 Fed. Reg. 56,724 (Dep't Commerce Oct.

4, 2007) ("Final Results").  In its Final Results, Commerce

found that because CPZ did not respond to its questionnaire, CPZ

merited an antidumping rate pursuant to adverse inferences

available under section 776 of the Tariff Act of 1930; 19 U.S.C.

§ 1677e(b) (2000).  Accordingly, Commerce assigned CPZ the PRC-

wide entity rate of 60.95%.[1]  CPZ does not contest the adverse

facts available ("AFA") finding, but it argues that this finding

should not automatically merit a presumption of state control

and the application of the PRC-wide entity rate.  CPZ maintains

that because it had previously qualified for a separate rate,

that separate rate should continue to apply.  In the

alternative, CPZ disputes the rate chosen as the PRC-wide entity

---

[1] The PRC-wide entity, including CPZ among other companies,
either failed to respond to Commerce's questionnaires, withheld
or failed to provide information in a timely manner or in the
form requested by Commerce, or otherwise impeded the proceeding.
The PRC-wide entity rate was thus calculated using total adverse
facts available pursuant to section 776 of the Tariff Act of
1930; 19 U.S.C. § 1677e(b) (2000).

rate.  For the reasons that follow, the Court affirms Commerce's findings.

## I.  JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).

A court shall hold unlawful Commerce's final determination in an antidumping administrative review if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." Tariff Act of 1930, § 516a, 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citing NLRB v. Nevada Consol. Copper Corp., 316 U.S. 105, 106 (1942)).  The Court need only find evidence "which could reasonably lead" to the conclusion drawn by Commerce, thus making it a "rational decision." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).

In determining the lawfulness of an agency's statutory construction, the Court examines "whether Congress's purpose and

intent on the question at issue is judicially ascertainable."
Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir.
1998) (construing Chevron, U.S.A., Inc. v. Nat. Resources Def.
Council, Inc., 467 U.S. 837, 843 n.9 (1984)).  If Congress's
intent is unclear, the Court must defer to the agency's
construction if it is reasonable. Chevron, 467 U.S. at 843-44.
Commerce's determination may be deemed unlawful "where Commerce
has failed to carry out its duties properly, relied on
inadequate facts or reasoning, or failed to provide an adequate
basis for its conclusions." Rhone Poulenc, Inc. v. United
States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996).

## II. DISCUSSION

### A. Commerce Properly Assigned CPZ the PRC-Wide Entity Rate

Regarding the assignment of the PRC-wide entity rate, CPZ
raises three arguments.  First, it disputes the application of
the PRC-wide entity rate and claims that a separate rate should
apply because CPZ received a separate rate in prior reviews.
Second, it argues that the calculation of the PRC-wide entity
rate is in conflict with the statutory requirement of
determining dumping margins by calculating the normal value and
U.S. price of each entry.  Third, CPZ argues that Commerce's
presumption of state control in non-market economy countries is
not entitled to Chevron deference because it is not based on a

formal statute or regulation.  The Court addresses each argument in turn.

        i.    CPZ Did Not Rebut the Presumption of State Control

        A company operating in an NME such as China is presumed to be under government control. Shandong Huanri (Group) Gen. Co. v. United States, 31 CIT __, __, 493 F. Supp. 2d 1353, 1357 (2007). Under this presumption, it is Commerce's policy to assign NME exporters of the same merchandise the countrywide antidumping duty rate.  Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002); Shandong Huanri, 31 CIT at __, 493 F. Supp. 2d at 1357; Manganese Metal from the People's Republic of China, 63 Fed. Reg. 12,440, 12,441 (Dep't Commerce Mar. 13, 1998) (final determination).  However, if a company establishes its independence from the government, it will be assigned a separate rate calculated through the same process utilized in market economies. Transcom, 294 F.3d at 1373.  To rebut the presumption of government control, an exporter must "'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact [de jure and de facto], with respect to exports.'" Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (quoting Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 935, 806 F. Supp. 1008, 1013-14 (1992)); see also Final Determination of Sales at Less Than Fair

Value: Sparklers from the People's Republic of China, 56 Fed.

Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991). "Absence of

de jure government control can be demonstrated by reference to

legislation and other governmental measures that decentralize

control. Absence of de facto government control can be

established by evidence that each exporter sets its prices

independently of the government and of other exporters, and that

each exporter keeps the proceeds of its sales." Sigma, 117 F.3d

at 1405 (citing Tianjin, 16 CIT at 935, 806 F. Supp. at 1013-

14).

    Here, CPZ maintains that it merits a separate rate, not

because it rebutted the presumption of state control for this

review period, but because it had been previously assigned a

separate rate in its New Shipper Review and in the 2001-2002

administrative review.[2] CPZ does not dispute that AFA applied

because CPZ did not respond to Commerce's questionnaire.

Nevertheless, CPZ claims that AFA should not equate to a

presumption of state control and the assignment of the PRC-wide

---

[2] CPZ qualified for a separate rate of 12.25% for the period of
June 1, 2000 through January 31, 2001. Tapered Roller Bearings
and Parts Thereof, Finished or Unfinished, from the People's
Republic of China: Final Results of New Shipper Reviews, 67 Fed.
Reg. 10,665 (Dep't Commerce Mar. 8, 2002). CPZ qualified for a
separate rate of 0% for the period of June 1, 2001 to May 31,
2002. Tapered Roller Bearings and Parts Thereof, Finished or
Unfinished, from the People's Republic of China: Final Results
of 2001-2002 Administrative Review and Partial Rescission of
Review, 68 Fed. Reg. 70,488 (Dep't Commerce Dec. 18, 2003).

entity rate.  This argument fails because "each administrative review is a separate segment of proceedings with its own unique facts.  Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews." Shandong Huarong Mach. Co. v. United States, 29 CIT 484, 491 (2005).  Each individual review consists of different sales, adjustments, and underlying information. Issues and Decision Memorandum for the Administrative Review of Fresh Garlic from the People's Republic of China, A-570-831 (Mar. 13, 2002), available at http://ia.ita.doc.gov/frn/summary/prc/02-6076-1.txt; Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China, 65 Fed. Reg. 66,691, 66,693 (Dep't Commerce Nov. 7, 2000) (preliminary results).

Because CPZ did not respond to the questionnaire and failed to provide any other information relating to this review period, there is no alternative but to apply the presumption of state control to CPZ and, in turn, assign the PRC-wide entity rate to the company.  Without any information to refute the presumption, CPZ does not merit a separate rate.

   ii.  A Presumption of State Control is Not in Conflict with the Statute

Secondly, CPZ argues that Commerce's calculation of the PRC-wide entity rate is not in accordance with law because the

presumption of state control for NMEs conflicts with the Tariff
Act of 1930, § 751(a)(2), 19 U.S.C. § 1675(a)(2)(A).  This
section of the Act requires Commerce to establish margins by
determining the normal value and U.S. price of each entry.[3]  In
its argument, CPZ does not explain how normal value could be
calculated under 19 U.S.C. § 1675(a)(2)(A) if no information has
been provided as to individual entries.  Because neither CPZ,
nor any other PRC-wide entity company, responded to any part of
the questionnaire or provide any other documentation, there is
no available information on the record for review.  It is thus
not possible for Commerce to calculate a dumping margin specific
to any of the entries during the period of review.  There is
also no information with which a separate rate could conceivably
be calculated.  Accordingly, there is no merit to this argument.

   iii. *Chevron* Deference is Applicable to the Presumption of
        State Control

   CPZ claims that Chevron deference is not applicable to
Commerce's presumption of state control for NMEs.  It argues
that there never was a formal declaration of this policy, and
informal means of establishing such procedures do not warrant

---

[3] 19 U.S.C. § 1675(a)(2)(A) states: "In general, for the purpose
of [determining the amount of any antidumping duty], the
administering authority shall determine (i) the normal value and
export price (or constructed export price) of each entry of the
subject merchandise, and (ii) the dumping margin for each such
entry."

Chevron deference.  However, contrary to CPZ's argument, Chevron deference does apply to the presumption regardless of whether the policy has been formally published.

Chevron deference has previously applied to methodologies developed by Commerce in antidumping duty contexts where no formal regulation was in place. Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001).  In addition, antidumping proceedings are considered to be rulings for the purposes of Chevron deference. Id.  Commerce is accorded substantial deference as the "master of antidumping law." Daewoo Elecs. Co. v. Int'l Union, 6 F.3d 1511, 1516 (Fed. Cir. 1993) (internal quotations omitted) (citing Consumer Prod. Div., SCM Corp. v. Silver Reed Am., Inc., 753 F.2d 1033, 1039 (Fed. Cir. 1985)).  Notably, Commerce has specifically declined to codify this "separate rates test" because of the flexibility required to evaluate the changing conditions in NME countries on a case-by-case basis. Antidumping Duties; Countervailing Duties; Proposed Rule, 61 Fed. Reg. 7308, 7311 (Dep't Commerce Feb. 27, 1996).  As such, Chevron deference remains appropriate.

Accordingly, the Court finds that there is substantial evidence to support an assignment of the PRC-wide entity rate to CPZ and it is in accordance with the law.  Thus, CPZ's argument for a separate rate is without merit.

B. <u>Commerce Sufficiently Corroborated the Rate Selected as the PRC-Wide Entity Rate</u>

CPZ also disputes the rate chosen as the PRC-wide entity rate. Specifically, CPZ argues that the 60.95% PRC-wide entity rate was not properly corroborated by Commerce and bears no relationship to CPZ's actual dumping margin. CPZ also states that this rate is impermissibly punitive. According to CPZ, the applicable rate should be 33.18%, which represents the PRC-wide entity rate in several prior, but not all, administrative reviews.[4]

---

[4] Commerce assigned 33.18% as the PRC-wide entity rate in the 1999-2000, 2000-2001, 2001-2002 periods of review, but 60.95% was assigned as the PRC-wide entity rate in the 2002-2003, 2003-2004, 2004-2005 periods of review. <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 66 Fed. Reg. 57,420, 57,422 (Dep't Commerce Nov. 15, 2001) (final results of 1999-2000 administrative review); <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 67 Fed. Reg. 68,990, 68,992 (Dep't Commerce Nov. 14, 2002) (final results of 2000-2001 administrative review); <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 68 Fed. Reg. 70,488, 70,489 (Dep't Commerce Dec. 18, 2003) (final results of 2001-2002 administrative review); <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 69 Fed. Reg. 42,041, 42,042 (Dep't Commerce July 13, 2004) (final results of 2002-2003 administrative review; <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 71 Fed. Reg. 2517, 2523 (Dep't Commerce Jan. 17, 2006) (final results of 2003-2004 administrative review); <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 71 Fed. Reg. 75,936, 75,937 (Dep't Commerce Dec. 19, 2006) (final results of 2004-2005 administrative review).

     i.    <u>It is Not Necessary to Corroborate the PRC-Wide Entity Rate with Respect to CPZ</u>

CPZ claims that Commerce did not corroborate the PRC-wide entity rate as required under the Tariff Act of 1930 § 776, 19 U.S.C. § 1677e(c).  Pursuant to this section, when applying a rate based on facts available, Commerce must corroborate the facts applied with "information from independent sources that are reasonably at their disposal."  This requirement ensures that the AFA rate chosen is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." <u>F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  CPZ claims that because of this requirement the rate must bear a relationship to the prior rates assigned to CPZ, and that the 60.95% rate is excessive considering the prior calculated rates for CPZ during the life of this antidumping order have ranged from 0% to 12.25%.  CPZ argues that the Court should reject the 60.95% rate because it was based on outdated sales data that was not indicative of CPZ's commercial practices.  However, CPZ mistakenly assumes that a correlation must be directly drawn between the chosen PRC-wide entity rate and CPZ's past rates.

In the context of an NME, Commerce typically assigns a countrywide rate when a company fails to respond and thus fails

to establish its eligibility for a separate rate. <u>Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent to Rescind in Part</u>, 70 Fed. Reg. 39,744, 39,751 (Dep't Commerce July 11, 2005); <u>see</u>, <u>e.g.</u>, <u>Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam</u>, 69 Fed. Reg. 71,005, 71,008 (Dep't Commerce Dec. 8, 2004), and accompanying Issues and Decision Memorandum at Comment 10; <u>Notice of Final Antidumping Duty Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam</u>, 68 Fed. Reg. 37,116, 37,119 (Dep't Commerce June 23, 2003).  In calculating the PRC-wide entity rate, it has been Commerce's "long-standing practice of assigning to respondents who fail to cooperate with Commerce's investigation the highest margin calculated for any party in the less-than-fair-value investigation or in any administrative review." <u>Sigma Corp.</u>, 117 F.3d at 1411; <u>see also</u> <u>Shandong Huanri</u>, 31 CIT at __, 493 F. Supp. 2d at 1363; <u>Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States</u>, 27 CIT 1059, 1070, 276 F. Supp. 2d 1371, 1381 (2003).  This practice follows the principle that the exporter should not benefit from its refusal to provide information, and emphasizes that past

practices in the industry are still relevant. D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed. Cir. 1997).

Here, Commerce assigned 60.95% as the PRC-wide entity rate based on total AFA, which was the highest calculated rate from any prior review period. CPZ is correct that a rate based on AFA must have a rational relationship to the specific company to which it is applied. See Reiner Brach GmbH & Co.KG v. United States, 26 CIT 549, 565, 206 F. Supp. 2d 1323, 1339 (2002); see also China Steel Corp. v. United States, 28 CIT 38, 60-61, 306 F. Supp. 2d 1291, 1311 (2004). However, CPZ was not assigned an AFA rate specific to the company itself; it was assigned the PRC-wide entity rate based on total AFA. Contrary to CPZ's argument, there is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company. It is not directly analogous to the process used in a market economy, where there is no countrywide rate. Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole. See, e.g., Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China, 65 Fed. Reg. 66,691, 66,694-95 (Dep't Commerce Nov. 7, 2000) (preliminary results). Thus, it is not necessary to corroborate the PRC-wide entity rate as to an individual company. The rate must only be generally corroborated as to the PRC-wide entity.

ii.  The PRC-Wide Entity Rate Was Sufficiently Corroborated

Because AFA were used in calculating the PRC-wide entity rate, Commerce must "to the extent practicable, corroborate [the] information [used as facts available] from independent sources that are reasonably at their disposal." Tariff Act of 1930 § 776, 19 U.S.C. § 1677e(c).  This includes "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under [19 U.S.C. § 1675] concerning the subject merchandise." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. 103-316 at 870 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4199; see also 19 C.F.R. § 351.308(c) (2005).  Commerce must "satisfy themselves that the secondary information to be used has probative value." Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 870 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4199.  To show the rate chosen has probative value, Commerce must assure itself of both the rate's (1) current reliability; and (2) the relevancy of the data used as its basis. Ferro Union, Inc. v. United States, 23 CIT 178, 205, 44 F. Supp. 2d 1310, 1335 (1999).

Unlike other sources of information, there are no independently verifiable sources for calculated dumping margins,

other than previous administrative determinations.  Hence, the reliability of the calculation stems from its basis in prior verified information in previous administrative reviews.  If Commerce chooses a calculated dumping margin from a prior segment of the proceeding, it is not necessary to question the reliability of the margin if it was calculated from verified sales and cost data. Shandong Huarong Gen. Group Corp. v. United States, 31 CIT __, Slip Op. 07-04 (Jan. 9, 2007).  Here, the 60.95% rate selected was originally calculated for Premier Bearing and Equipment Ltd. in the amended final results for the administrative review of the period of June 1, 1993 to May 31, 1994. Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China, 67 Fed. Reg. 79,902, 79,903 (Dep't Commerce Dec. 31, 2002) (amended final results).  This rate was upheld by this Court in 2002 and later by the Federal Circuit. Peer Bearing Co. v. United States, 26 CIT 590 (2002), aff'd, Peer Bearing Co. v. United States, Appeal No. 02-1519 (Fed. Cir. Oct. 14, 2003).  No evidence has been presented in the current review that would call into question the trustworthiness of this information.  It is thus considered reliable data.

Regarding the relevance of the chosen PRC-wide entity rate, CPZ argues that because the 60.95% rate was first calculated in the 1993-1994 administrative review period, the data is now

outdated and cannot be considered relevant to the current review.  However, there was no information presented, by CPZ or any other named respondent, for the 2005-2006 administrative review period.  Accordingly, even though the original calculation is based on data provided for the 1993-1994 review, there is no current information that would indicate that it is not presently relevant.

In addition, the age of the information alone does not call into question the relevance of the chosen rate.  This situation differs from American Silicon Technologies v. United States, 26 CIT 1216, 1222-23, 240 F. Supp. 2d 1306, 1312 (2002), where this court found that the AFA rate was not relevant.  The rate was based on six-year old data, but it was also 25% higher than any rate calculated based on actual data and thus not representative of true dumping margins.[5] Id.  With respect to the present dumping order, 60.95% rate was the PRC-wide entity rate as recently as the 2004-2005 administrative review period, only one

---

[5] CPZ's arguments based on Ferro Union, Inc. v. United States, 23 CIT 178, 44 F. Supp. 2d 1310 (1999) are similarly misplaced.  In Ferro Union, there were other rates that had been previously calculated specifically for the company in question and Commerce chose a prior rate for another company. Id. at 202-03, 44 F. Supp. 2d at 1333.  The court found that Commerce had not properly corroborated the rate chosen. Id. at 205, 44 F. Supp. 2d at 1335.  The rate in question had been selected specifically for the respondent and Commerce was required to show a rational relationship to the individual respondent. Id.  In the current situation, we are dealing with a countrywide rate, not an individual rate.

year prior to the current review period. Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of 2004-2005 Administrative Review and Partial Rescission of Review, 71 Fed. Reg. 75,936, 75,937 (Dep't Commerce Dec. 19, 2006). Additionally, the 60.95% rate was most recently corroborated during the 2003-2004 administrative review. Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China: Preliminary Result of Antidumping Duty Administrative Review and Notice of Intent to Rescind in Part, 70 Fed. Reg. 39,744, 39,752 (Dep't Commerce July 11, 2005). This is a more recent review than the review where 33.18%, the rate recommended by CPZ, was calculated as the PRC-wide entity rate. Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of 2001-2002 Administrative Review and Partial Rescission of Review, 68 Fed. Reg. 70,488, 70,489 (Dep't Commerce Dec. 18, 2003).

The PRC-wide entity rate is an appropriate estimate of what the actual dumping margin would be for an unverifiable Chinese exporter of tapered roller bearings. Because the 60.95% rate is both reliable and relevant, the rate has been properly corroborated for the 2005-2006 administrative review period. Accordingly, the Court finds that the PRC-wide entity rate

chosen by Commerce is supported by substantial evidence and is in accordance with the law.

> iii. The PRC-Wide Entity Rate is Not Punitive

In determining a rate based on AFA, Commerce must "appropriately balanc[e] th[e] goal of accuracy against the risk of creating a punitive margin." Timken Co. v. United States, 26 CIT 1072, 1076, 240 F. Supp. 2d 1228, 1234 (2002). For a rate to be considered punitive, it must be shown that Commerce rejected "low-margin information in favor of high-margin information that is demonstrably less probative of current conditions." Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990). As demonstrated above, the rate chosen by Commerce is both reliable and relevant to the current review period. Thus, the rate is not demonstrably less probative than another rate and is not punitive.

## III. CONCLUSION

CPZ is not entitled to a separate rate because it failed to provide information rebutting the presumption of state control. Commerce properly determined that the PRC-wide entity rate applies. The rate selected by Commerce as the PRC-wide entity rate was sufficiently corroborated and was not punitive.

For the foregoing reasons, the Court sustains Commerce's final

determination.

                                        __/s/ Richard W. Goldberg
                                        **Richard W. Goldberg**
                                        **Senior Judge**

**Date:        December 8, 2008**
              **New York, New York**