Slip Op. 09-64

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| | : | |
| SHANDONG MACHINERY IMPORT & EXPORT COMPANY | : | |
| | : | |
| Plaintiff, | : | |
| | : | Before: Richard K. Eaton, Judge |
| v. | : | |
| | : | Court No. 07-00355 |
| UNITED STATES, | : | |
| | : | Public Version |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| AMES TRUE TEMPER and COUNCIL TOOL COMPANY, INC., | : | |
| | : | |
| Def.-Ints. | : | |
| | : | |

OPINION AND ORDER

[Department of Commerce's final results sustained in part and remanded]

Dated: June 24, 2009

*Hume & Associates LLC* (*Robert T. Hume*) for plaintiff.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Courtney E. Sheehan*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Nithya Nagarajan*), of counsel, for defendant.

*Wiley Rein LLP* (*Eileen P. Bradner*, *Timothy C. Brightbill* and *Maureen E. Thorson*), for defendant-intervenor Ames True Temper.

*Kelley Drye & Warren, LLP* (*Eric McClafferty*), for defendant-intervenor Council Tool Company, Inc.

Eaton, Judge:  This action is before the court on plaintiff Shandong Machinery Import & Export Company's ("SMC") USCIT R. 56.2 motion for judgment upon the agency record.  *See* Pl.'s Mem. Supp. Mot. J. Agency R. ("Pl.'s Mem.").  Defendant United States together with defendant-intervenors Ames True Temper and the Council Tool Company, Inc. oppose this motion.  *See* Def.'s Resp. to Pl.'s Mot. for J. Agency R. ("Def.'s Resp."); Def.-Int.'s Br. in Resp. to Pl.'s Mot. for J. Agency R.; Resp. Br. of Def.-Int. Council Tool Company, Inc.

By its motion, SMC challenges the final results of the United States Department of Commerce's ("Commerce" or the "Department") fifteenth administrative review of antidumping duty orders covering heavy forged hand tools ("HFHTs") from the People's Republic of China ("PRC") for the period of review beginning on February 1, 2005, and ending on January 30, 2006 ("POR").  *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 72 Fed. Reg. 51,787 (Dep't of Commerce Sept. 11, 2007) (final results) and the accompanying Issues and Decision Memorandum (Dep't of Commerce Sept. 4, 2007) ("Issues & Dec. Mem.") (collectively, "Final  Results").  United States imports of HFHTs are subject to individual antidumping duty orders covering separate categories of goods, including those at issue here:  bars/wedges; hammers/sledges; and axes/adzes.  *Id*.

In the Final Results, Commerce found that plaintiff failed

to rebut the non-market economy ("NME") presumption of government control.[1]  As a result, Commerce applied country-wide antidumping duty rates ("PRC-wide rates") to SMC's exports.  *See* Issues & Dec. Mem. at Comment 1; HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 72 Fed. Reg. 10,492 (Dep't of Commerce Mar. 8, 2007) ("Prelim. Results").  The PRC-wide rates assigned by Commerce were: 139.31 percent for bars/wedges, 45.42 percent for hammers/sledges, and 189.37 percent for axes/adzes.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).  For the following reasons, the court sustains Commerce's Final Results in part and remands the rate for hammers/sledges to Commerce for further findings consistent with this opinion.

---

[1]     A non-market economy includes "any foreign country that the administering authority [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A) (2006); *Shandong Huarong Gen. Group Corp. v. United States*, 28 CIT 1624, 1625 n.1, Slip Op. 04-117 at 3 n.1 (2004) (not reported in the Federal Supplement).

"Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(i) (2006).  The PRC has been determined to be an NME country.  The Department has treated the PRC as a non-market economy country in all past antidumping investigations.  *Zhejiang Native Produce & Animal By-Products Imp. and Exp. Corp. v. United States*, 27 CIT 1827, 1834 n.14, Slip Op. 03-151 at 12 n.14 (2003) (not reported in the Federal Supplement) (citations omitted).

STANDARD OF REVIEW

When reviewing Commerce's final antidumping determinations, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).

DISCUSSION

I.   PRC-Wide Rate

A.   Legal Framework

When conducting an investigation or review of an NME country, Commerce employs a presumption of state control.  *See Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 100, 44 F. Supp. 2d 229, 242 (1999). To rebut this presumption and thus qualify for a separate rate, an exporter must "affirmatively demonstrate its entitlement to a separate, company-specific margin . . . ."  *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) ("*Sigma*") (citation and quotation omitted).

To establish that a firm is sufficiently independent from government control to be entitled to a separate rate, the Department requires respondents to demonstrate the absence of both *de jure* and *de facto* government control over export activities.  *See Peer Bearing Co.-Changshan v. United States*, 32

CIT \_\_, \_\_, 587 F. Supp. 2d 1319, 1324 (2008) *("Peer Bearing")*;
*see also Sparklers from the PRC*, 56 Fed. Reg. 20,588, 20,589
(Dep't of Commerce May 6, 1991) (final determination of sales at
less than fair value).

> Absence of *de jure* government control can be
> demonstrated by reference to legislation and
> other governmental measures that decentralize
> control.  Absence of *de facto* government
> control can be established by evidence that
> each exporter sets its prices independently
> of the government and of other exporters, and
> that each exporter keeps the proceeds of its
> sales.

*Sigma*, 117 F.3d at 1405 (citations omitted).

When a company fails to rebut the presumption of state
control, Commerce employs that presumption and applies the PRC-
wide rate to its products.  *See Id.* at 1405.

B.   Application of PRC-Wide Rate to SMC

In the Final Results, Commerce stated that SMC failed to
"supply the Department with all the information and documentation
necessary for it to demonstrate that it is eligible for separate
rates."  Issues & Dec. Mem. at Comment 1.  Moreover, it found
that

> [d]espite being given several opportunities,
> SMC failed to provide complete or consistent
> responses to our questions, rendering it
> impossible to adequately determine whether or
> not SMC's business operations are free from
> de jure or de facto government control.  We
> are unable to definitively determine who owns

SMC, who controls SMC, and the nature of
SMC's relationship with the national,
provincial, and local governments.[2]

Issues & Dec. Mem. at Comment 1. Accordingly, Commerce concluded
that plaintiff failed to rebut the presumption of government
control and failed to establish its eligibility for a rate
separate from the PRC-wide rate.

By its motion, plaintiff contends that Commerce wrongfully
applied the PRC-wide rates to its sales of bars/wedges,
hammers/sledges and axes/adzes because it demonstrated absence of
government control and qualified for separate rates. Pl.'s Mem.
12-16. Plaintiff makes several arguments to support its
position. Specifically, the company states that the PRC Foreign
Trade Law, PRC Whole People Law, its business license and its
export license demonstrate *de jure* independence from state
control. Pl.'s Mem. 13-14. Moreover, plaintiff asserts that it
demonstrated *de facto* independence, particularly by producing
proof that the Shandong Foreign Trade Economic Committee had no
role in its export activities and that the Committee has never
provided any capital to plaintiff. Pl.'s Mem. 16.

In response, Commerce first argues that it was unable to
determine who owned or controlled plaintiff based on plaintiff's

---

[2]     Here, because the court finds that SMC has failed to
demonstrate that it is free of national governmental control, it
makes no finding with respect to provincial or local governmental
control.

responses to a series of questionnaires.  Def.'s Resp. 15.

Commerce states that, in its original questionnaire, it asked

plaintiff to "describe and explain" who owned the company,

including the "full name and address of the individual(s),

corporation(s), or entities that own your company."  SMC's Resp.

to Commerce's Section A Questionnaire dated May 11, 2006

("Original Section A Resp.") 8.  Plaintiff responded, "SMC is

owned by its shareholders[,]" but failed to include the full name

or address of any of these "shareholders."  Original Section A

Resp. 8.

    Dissatisfied with plaintiff's response, Commerce then issued

its first supplemental questionnaire.  *See* SMC's Resp. to

Commerce's Supp. Sections A, C, and D Questionnaires dated May

23, 2006 ("First Supp. Resp.") 3-4.  The first supplemental

questionnaire asked whether any other person or party had ever

owned plaintiff, whether plaintiff traded publicly, how many

shareholders plaintiff had, who held more than 1.99 percent of

plaintiff's shares, and asked for a description of the classes of

plaintiff's shares together with a  "detailed text explanation of

the ownership of SMC."  First Supp. Resp. 3-4.  Plaintiff

responded to the first supplemental questionnaire by stating that

it was "all-people owned, which means each member of SMC is

responsible for his or her gain and loss.  SMC is not a limited

liability company.  To the extent that shareholders refer to the

employees at SMC; SMC currently has [a certain number of] employee 'shareholders.'" First Supp. Resp. 4. Plaintiff also stated that it was independent from the central and provincial governments, a "private enterprise," "not publicly traded," and that it did "not have classes of shares." First Supp. Resp. 3-4.

Commerce remained unsatisfied with plaintiff's questionnaire responses and issued a second supplemental questionnaire. In this second supplemental questionnaire, Commerce asked plaintiff whether "all-people owned" meant that "SMC [was] owned by all the people of the [PRC]." SMC's Resp. to Commerce's Supp. Sections A, C, and D Questionnaires dated Jan. 22, 2007 ("Second Supp. Resp.") 1. Plaintiff responded that "state-owned" and "all people-owned" had "the same meaning and [were] interchangeable." Second Supp. Resp. 1. With its response to the second supplemental questionnaire, plaintiff also included a letter from the Shandong Province Foreign Economic Trade Cooperation Bureau ("SPFETCB") "certifying the ownership status of SMC." Second Supp. Resp. 1. The letter states, "Shandong Machinery Import & Export Group Corp. is [an] all-people owned enterprise, the description shown on its business license is state-owned enterprise, all-people owned and state-owned enterprises are the same in term[s] of character." Second Supp. Resp. at Ex. 1.

In the second supplemental questionnaire, Commerce also asked plaintiff to "[p]rovide a detailed text explanation of the

difference between the terms 'all-people owned' and 'whole people owned,' as cited in" plaintiff's response to the first supplemental questionnaire.  Second Supp. Resp. 1.  Plaintiff responded by referencing Article 6 of the PRC Constitution and stating that "all-people owned" meant "collective ownership by the working people." Second Supp. Resp. 1.

> According to Article 6 of the Constitution Law of the PRC, "the basis of the socialist economic system of the PRC is the socialist public ownership of the means of production, namely, ownership by the whole people and collective ownership by the working people." The terms "state-owned" enterprise, "all people-owned" enterprise, and "whole people-owned" enterprise have the same meaning and are interchangeable.  In order to clarify SMC's ownership status as an all people-owned enterprise, Shandong Province Foreign Economic Trade Cooperation Bureau has provided an official letter certifying the ownership status of SMC.

Second Supp. Resp. 2.

In addition, in the second supplemental questionnaire, Commerce asked plaintiff to explain material on certain websites that suggested SMC might be a "nationalized business," "state-owned business" or "state-owned enterprise." Second Supp. Resp. 2, 4-5.  Rather than explaining the website material, plaintiff responded by referencing Article 6 of the PRC Constitution and the SPFETCB letter.  Second Supp. Resp. 2, 4-5.  Additionally, in the second supplemental questionnaire, Commerce asked plaintiff to explain the word "private" in its first supplemental

questionnaire response that it was an "'all-people owned' private enterprise." Second Supp. Resp. 3. Plaintiff responded, "SMC regrets the use of the word 'private' in its prior response and hereby retracts the use of this word. SMC merely meant to convey that SMC is non-public." Second Supp. Resp. 3.

Further, in the second supplemental questionnaire, Commerce again asked plaintiff to "[l]ist and provide the address of any and every entity or person who holds more than 1.99 percent of the shares of SMC." Second Supp. Resp. 3. In its response, plaintiff referred to "Shandong Foreign Trade Economic Committee." Second Supp. Resp. 4.[3] Plaintiff attempted to qualify its response by stating that the Committee "merely provides a supervisory function to SMC." Second Supp. Resp. 4.

As the foregoing demonstrates, plaintiff failed to rebut the presumption of *de jure* government control, i.e., it has not demonstrated that it is not owned or controlled by the PRC. Indeed, rather than demonstrating the absence of state control, plaintiff's answers suggest that the company was, in fact, under state control. This being the case, because both *de jure* and *de facto* independence must be shown in order to qualify for a separate rate, the court need not address plaintiff's claims of

---

[3] Plaintiff stated that "Shandong Foreign Trade Economic Committee . . . is SMC's investor and the department in charge." Second Supp. Resp. 4.

*de facto* independence from governmental control.  *See Peer Bearing*, 32 CIT at __, 587 F. Supp. 2d at 1324.

Because SMC has failed to rebut the presumption that it is controlled by the Chinese government it is not entitled to a separate rate.  *See Shandong Huarong Gen. Group Corp. v. United States*, 27 CIT 1568, 1591, Slip Op. 03-135 at 37 (2003) (not reported in the Federal Supplement).  As a result, Commerce may apply the PRC-wide rate to that company's exports.  *Id*. at 38.

II.   Selection of PRC-Wide Rates for Bars/Wedges,
      Hammers/Sledges, and Axes/Adzes

      A.   Legal Framework

In seeking a PRC-wide rate based on AFA, the Department may use information derived from the petition, a final determination in the investigation, any prior administrative review, or any other information placed on the record.  *See* 19 U.S.C. § 1677e(b); Statement of Admin. Action accompanying the Uruguay Round Agreements Act, H.R. Rep. 103-316 at 870, reprinted in 1994 U.S.C.C.A.N. 4040, 4199 (stating that secondary information is "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under [19 U.S.C. § 1675] concerning the subject merchandise").  Where, as here, Commerce relies on secondary information such as calculated rates

from previous reviews, rather than information obtained in the course of a current investigation or review, the Department must "to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c); *see* 19 C.F.R. § 351.308(d). To corroborate secondary information, Commerce must "examine whether the secondary information to be used has probative value." *See* 19 C.F.R. § 351.308(d).

Probative value means that the rate must be both a) reliable and b) relevant. *See Ferro Union, Inc. v. United States*, 23 CIT 178, 202, 44 F. Supp. 2d 1310, 1333 (1999) ("*Ferro Union*"). Commerce must do more than assume "any prior calculated margin for the industry is reliable and relevant." *Id.* at 204, 44 F. Supp. 2d at 1334. Indeed, "[i]n order to comply with the statute and the [Statement of Administrative Action]'s statement that corroborated information is probative information, Commerce must assure itself that the margin it applies is relevant, and not outdated, or lacking a rational relationship to [the respondent]." *Id.* at 205, 44 F. Supp. 2d at 1335.

Importantly, in the NME situation, there is no requirement that the rate based on AFA relate specifically to the individual company. *See Peer Bearing Co.*, 32 CIT at __, 587 F. Supp. 2d at 1327. Rather, "the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole."

*Id.* at __, 587 F. Supp. 2d at 1327 (citation omitted).  Thus, the

rates Commerce selects in this case must be reliable and relevant

to the PRC-wide entity,[4] not specifically to SMC.


        B.    Corroboration of Secondary Information

        Commerce argues that the secondary information it used is

reliable and relevant such that it has probative value.  It

states:

> [T]o corroborate secondary information, the
> Department will, to the extent practicable,
> examine the reliability and relevance of the
> information used.  However, unlike other
> types of information . . . there are no
> independent sources for calculated dumping
> margins.  The only sources for calculated
> margins are administrative determinations.
> These rates are applied to the PRC-wide
> entity, i.e., only to companies not eligible
> for a separate rate with regard to the
> individual class or kind of merchandise.  No
> information has been presented in the current
> review that calls into question the
> reliability of the information used for these
> AFA rates.  Thus, the Department continues to
> find that the information is reliable.

Issues & Dec. Mem. at Comment 3.  Plaintiff challenges the

reliability and relevance of the rates.  Pl.'s Mem. 23.

Specifically, plaintiff argues that the Department "did not

utilize any measure to verify independently the reliability of

---

        [4]    In antidumping proceedings, the PRC-wide entity and all
of its components are considered to be a single respondent.  *See*
*Sigma*, 117 F.3d at 1405-07.

the Bars/Wedges or Hammers/Sledges rates" and that the "Department failed to verify and corroborate the calculated PRC-wide and AFA rate" applied to axes/adzes.  Pl.'s Mem. 31.

The court finds that substantial evidence supports the conclusion that two of the selected AFA rates, i.e., 139.31 percent for bars/wedges and 189.37 percent for axes/adzes, were properly corroborated as being reliable and, because of the application of AFA, are relevant to the PRC as a whole.  As an initial matter, the court finds reasonable the Department's decision to base the PRC-wide rates on AFA.  Each of the four respondents were found to have been subject to an AFA rate and nothing has been placed on the record to indicate that the country-wide entity would not similarly be found to be subject to AFA.  *See* AFA and Corroboration Memo. for Company Rates dated Feb. 28, 2007 ("AFA and Corroboration Memo.") at 12.

With respect to the rates themselves, when faced with determining a country-wide rate based on what it calls "total AFA,"[5] Commerce faces a difficult task.  Unlike rates that are

---

[5]     Commerce references "total adverse facts available," which is not referenced in either the statute or the agency's regulations.  The phrase can be understood, within the context of this case, as referring to Commerce's application of adverse facts available not only to the facts pertaining to specific sales for which information was not provided, but to the facts respecting all of respondents' sales encompassed by the relevant antidumping duty order.  *See Shandong Huarong Mach. Co. v. United States*, 30 CIT 1269, 1271 n.2, 435 F. Supp. 2d 1261, 1265 n.2 (2006), (citing *Gerber Food (Yunnan) Co., Ltd. v. United States*,

calculated using responses to questionnaires, Commerce cannot
calculate an AFA rate for the PRC as a whole, because there are
no questionnaire responses from the PRC itself on which to rely.
What the record does contain is the questionnaire responses from
SMC and the other respondents in this review.  However, because
Commerce found all of the respondents to be subject to the
application of total AFA, the responses themselves were deemed
non-probative.  Indeed, for Commerce, the only value of the
responses is to confirm that this country-wide rate should be
based on AFA.  It is worth noting that the decision to apply AFA
to the country-wide entity has not been contested by any party.
Thus, the decision to apply an AFA rate to the PRC as a whole is
reasonable and is sustained.

To determine an AFA rate, Commerce turned to its often used
methodology of choosing the highest rate from the original
investigation or from prior reviews.  *See* AFA and Corroboration
Memo.; *Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT
189, 360 F. Supp. 2d 1339 (2005) (upholding the AFA rate as
application of the highest available dumping margin from a
different respondent in a prior administrative review); *Kompass
Food Trading Int'l v. United States*, 24 CIT 678, 683 Slip Op. 00-

_____

29 CIT __, __, 387 F. Supp. 2d 1270, 1285 n.3 (2005)).

90 (2000) (not reported in the Federal Supplement) (affirming the Department's use of the highest available dumping margin from a different, fully cooperative respondent in the less than fair value investigation).

For bars/wedges, Commerce assigned the 139.31 percent rate as the PRC-wide margin. Def.'s Mem. 28; Issues & Dec. Mem. at Comment 3. This is the rate calculated using verified information provided by Tianjin Machinery Import & Export Corporation, another respondent, in the eighth administrative review of the bars/wedges order. *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 71 Fed. Reg. 54,269 at Comment 2 (Dep't of Commerce Sept. 14, 2006) (final results). Commerce recently found this AFA and PRC-wide rate to be sufficiently corroborated for use in the fourteenth administrative review. Def.'s Mem. 28; Issues & Dec. Mem. at Comment 3; HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 71 Fed. Reg. 54,269 at Comment 2 (Dep't of Commerce Sept. 14, 2006) (final results).

For axes/adzes, Commerce used the calculated 189.37 percent rate for Shandong Huarong Machinery Co., Ltd., based on its verified sales and production data from the fourteenth administrative review. *See* Def.'s Mem. 28; Issues & Dec. Mem. at Comment 2; HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 71 Fed. Reg. 54,269 at Comment 9 (Dep't of

Commerce Sept. 14, 2006) (final results).  Commerce then applied

this rate as AFA for the PRC-wide entity here.  *See* HFHTs,

Finished or Unfinished, With or Without Handles, From the PRC, 71

Fed. Reg. 54,269 at Comment 9 (Dep't of Commerce Sept. 14, 2006)

(final results).

As noted, Commerce is required to corroborate secondary

information "to the extent practicable."  19 U.S.C. § 1677e(c).

Here, because the 139.31 percent rate for bars/wedges and the

189.37 percent rate for axes/adzes: (1) are from earlier reviews

of the same categories of merchandise; (2) are based on verified

information taken from similar companies; (3) have not been found

either unsupported by substantial evidence nor contrary to law by

any court; and (4) with the exception of plaintiff's

subsidization argument, have not been challenged by any record

evidence,[6] Commerce has satisfied its corroboration requirement.

The court thus upholds Commerce's determination that the 139.31

percent rate for bars/wedges and 189.37 percent rate for

------------------------------------------------------------

[6]     While it might seem a heavy burden on the plaintiff to
anticipate the use of these rates for assignment pursuant to AFA,
and to interpose objections to them, these rates have been used
as AFA consistently in past reviews.  *See, e.g.*, HFHTs, Finished
or Unfinished, With or Without Handles, From the PRC, 71 Fed.
Reg. 54,269 (Dep't of Commerce Sept. 14, 2006) (final results)
(fourteenth review); HFHTs, Finished or Unfinished, With or
Without Handles, From the PRC, 70 Fed. Reg. 54,897 (Dep't of
Commerce Sept. 19, 2005) (final results)(thirteenth review);
HFHTs, Finished or Unfinished, With or Without Handles, From the
PRC, 69 Fed. Reg. 55,581 (Dep't of Commerce Sept. 15, 2004)
(final results) (twelfth review).

axes/adzes are reliable.

In addition to its contentions as to the reliability and relevance of the assigned rates, plaintiff insists that the MUTT® scraper should be excluded from the calculated PRC-wide and AFA rate for axes/adzes. Pl.'s Mem. 30-31. That is, "[i]n effect, the . . . calculated rate [from the fourteenth review] for Axes/Adzes is based solely on the MUTT® scraper submitted to the Department for a scope review." Pl.'s Mem. 30. Plaintiff contends that there is "compelling evidence" that the manufacturing process used in creating the MUTT® scraper should preclude it from inclusion in the scope of the HFHTs category. Pl.'s Mem. 30. According to plaintiff, if the MUTT® scraper sales were eliminated from consideration, then Commerce would be required to find a lower rate for axes/adzes. However, as plaintiff also acknowledges, this Court has previously held that the MUTT is, in fact, subject to the terms of the axes/adzes order. Pl.'s Mem. 30; *see Tianjin Mach. Imp. & Exp. Corp. v. United States*, 31 CIT __, __, Slip Op. 07-131 at 17 n.4 (Aug. 28, 2007) (not reported in the Federal Supplement) ("*Tianjin*"). That being the case, there is no reason to exclude a rate based on MUTT® exports.

With respect to hammers/sledges, the court reaches a different conclusion. For this merchandise Commerce used the 45.42 percent rate calculated as the best information available

("BIA")[7] rate during a 1991 less than fair value ("LTFV")
investigation of the China National Machinery Import & Export
Corporation. *See* Def.'s Mem. 28; Issues & Dec. Mem. at Comment
3; HFHTs, Finished or Unfinished, With or Without Handles, From
the PRC, 56 Fed. Reg. 241 (Dep't of Commerce Jan. 3, 1991) (final
results). Commerce most recently used this rate as the AFA and
PRC-wide rate during the fourteenth administrative review. *See*
Def.'s Mem. 28; Issues & Dec. Mem. at Comment 3; HFHTs, Finished
or Unfinished, With or Without Handles, From the PRC, 71 Fed.
Reg. 54,269 (Dep't of Commerce Sept. 14, 2006) (final results).

The rate, however, was not corroborated. Rather, the rate,
based on BIA, was calculated in the 1991 LTFV investigation of
the China National Machinery Import & Export Corporation. *See*
HFHTs, Finished or Unfinished, With or Without Handles, From the
PRC, 56 Fed. Reg. 241 (Dep't of Commerce Jan. 3, 1991) (final
results) ("Because we have rejected CMC's questionnaire response
and are using best information available for our determinations,

---

[7]     BIA is the predecessor to AFA. In the Statement of
Administrative Action of the Uruguay Round Agreements Act of
1994, Pub.L. No. 103-465, 108 Stat. 4809 (1994), Congress
explained that the Uruguay Round amended the prior law, which
"mandate[d] use of the best information available (commonly
referred to as BIA) if a person refuse[d] or [was] unable to
produce information in a timely manner or in the form required."
H.R. Doc. No. 103-316 (1994) at 868, reprinted in 1994
U.S.C.C.A.N. 4040, 4198. *Shandong Huarong Mach. Co. v. United
States,* 30 CIT 1269, 1282 n.9, 435 F. Supp. 2d 1261, 1274 n.9
(2006).

we did not verify CMC's questionnaire response."). Rather than using verified information, the Department used information submitted by the petitioner. Specifically, Commerce calculated an average of the margins contained in the petition for each class or kind of merchandise, as adjusted for calculation errors in the petition. *See Id*. at Comment 4; HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 55 Fed. Reg. 42,420 (Dep't of Commerce Oct. 19, 1990) (preliminary determination). Therefore, Commerce took no steps to corroborate the information during the LTFV investigation. That being the case, Commerce failed to comply with the corroboration requirement found in 19 U.S.C. § 1677e(c) and 19 C.F.R. § 351.308(d). Consequently, the 45.42 percent rate is not reliable, and the court directs Commerce, on remand, to assign a different rate to hammers/sledges that has been "corroborated according to its reliability and relevance to the country-wide entity as a whole." *Peer Bearing*, 31 CIT at __, 587 F. Supp. 2d at 1327 (citation omitted).

    C.    The Bars/Wedges Rate Is Not Punitive

Plaintiff also contends that the 139.31 percent rate for bars/wedges is punitive. Pl.'s Mem. 27. In making its case, plaintiff argues that this Court invalidated the 139.31 percent rate for bars and wedges as punitive and aberrational in *Shandong*

*Huarong Gen. Corp. v. United States*, 29 CIT 1227, Slip Op. 05-129 (2005) (not published in the Federal Supplement) ("*Huarong III*"). In fact, in *Huarong III*, this Court remanded Commerce's use of the rate not because the rate was unreliable or irrelevant to the PRC-wide entity, but because the rate lacked specific reliability and relevance to the individual companies that were parties to that case. *Huarong III*, 29 CIT at 1332, Slip Op. 05-129 at 12. The *Huarong III* plaintiffs qualified for separate rates. *Huarong III*, 29 CIT at 1228, Slip Op. 05-129 at 3. Here, SMC failed to qualify for a separate rate and Commerce has no obligation to corroborate the rate as to SMC itself. *See Peer Bearing*, 31 CIT at __, 587 F. Supp. 2d at 1327. Thus, *Huarong III* does not support plaintiff's contention. Moreover, plaintiff cites to no evidence on the record relating to what a calculated rate for the PRC-wide entity might be. As such, plaintiff has made no convincing argument that the assigned rate is punitive.

> D. There Is No Evidence of Subsidization in the AFA/PRC-Wide Rates

Lastly, plaintiff contends that the Department must recalculate the margins from prior segments of these proceedings in order to corroborate the AFA/PRC-wide rates. Specifically, plaintiff contends that "[t]he Department previously determined Indian export data cannot be used for surrogate values because of

Indian subsidies and that South Korea, Thailand, and Indonesia maintain broadly available, non-industry specific export subsidies that may benefit all exporters to all export markets." Pl.'s Mem. 23-24 (citation omitted).  Accordingly, plaintiff argues, the Department must exclude: "1) any Indian imports of steel from the United Kingdom, Belgium, Canada, or Germany in calculating the AFA/PRC-wide rate for Hammers/Sledges and 2) the Indian imports of steel from the United Kingdom, Belgium, and Germany in calculating the AFA/PRC-wide rate for Axes/Adzes." Pl.'s Mem. 24.  In addition, plaintiff argues that the Department must also exclude United States data because the United States subsidizes exports.  Pl.'s Mem. 25.

Despite plaintiff's contentions that the AFA/PRC-wide rates applied to sales of bars/wedges and hammers/sledges are distorted by subsidization, its claim must be rejected for two reasons: first, because it is well settled that the "record for judicial review should ordinarily not contain material from separate investigations, including records of separate administrative reviews arising out of the same antidumping duty order, as is the case here,"(*Sanyo Elec. Co. v. United States*, 23 CIT 355, 361, 86 F. Supp. 2d 1232, 1239 (1999) (citations and quotation omitted)); and second, because this Court has continually rejected this argument where, as here, plaintiffs have "provided no evidence to support their assertion" that "the surrogate value Commerce

employed was distorted by subsidies." *See Tianjin*, 31 CIT at __, Slip Op. 07-131 at 40 ("While plaintiffs insist that the surrogate value Commerce employed was distorted by subsidies, they have provided no evidence to support their assertion. Thus, the court cannot credit plaintiffs' subsidy objection."). Accordingly, plaintiffs' assertion that the objected to values were subsidized must be rejected.

CONCLUSION

For the foregoing reasons, the court sustains Commerce's final determination in part and remands for further findings, consistent with this opinion, with respect to the calculated 45.42 percent rate for hammers/sledges. The remand results shall be due on November 2, 2009; comments to the remand results shall be due on December 7, 2009; and replies to such comments shall be due on December 21, 2009.

                                        /s/ Richard K.Eaton
                                       Richard K. Eaton

Dated:     June 24, 2009
           New York, New York